Howard B. KESSLER, M.D., Andrew
H. Shaer, M.D., and Locke W.
Barber, D.O., Appellees,

v.

George J. BRODER, M.D., Michael R.
Clair, M.D., William H. Hartz, M.D.,
Philip J. Moldofsky, M.D., Jay S.
Rosenblum, M.D., Delaware Open
MRI Radiology Associates, P.A., Gen-
eral Partner of Delaware Open MRI,
L.L.C. and Delaware Open MRI II,
L.L.C., County Line Open MRI, Inc.,
General Partner of Pennsylvania
Open MRI at County Line Plaza, L.P.,
and Pennsylvania Open MRI at
Roosevelt Plaza, L.P., Andorra Open
MRI, Inc., General Partner of Andor-
ra Open MRI, L.P., and Jeanes Radiol-
ogy Associates, P.C., and Its Unincor-
porated Division, Pennsylvania Open
MRI at Grant Plaza.

Appeal of: George J. Broder, M.D., Mi-
chael R. Clair, M.D., William H. Hartz,
Moldofsky & Rosenblum.

Superior Court of Pennsylvania.

Argued Dec. 3, 2003.

Filed June 1, 2004.

Howard D. Scher, Philadelphia, for appellants.

Marvin Wilenzik, Blue Bell, for appellees.

Before: DEL SOLE, P.J., MUSMANNO and TAMILIA, JJ.

TAMILIA, J.

¶ 1 Appellants appeal the May 13, 2003 Order entering a mandatory, preliminary injunction requiring them to provide appellees with one out of every three readings of certain magnetic resonance images (MRI's).

¶ 2 At issue is a dispute among radiologists who co-own MRI centers. Appellants (the Broder Group) [1] are the majority shareholders of the four defendant corporations.[2] Appellees (the Kessler Group) [3] are the minority shareholders. The Kessler Group initiated this action in which they allege, *inter alia,* an oral agreement pursuant to which the Broder Group promised to allocate MRI reads from the commonly owned MRI centers in proportion to the shareholders' ownership interests in the defendant corporations, i.e. the Kessler Group would receive approximately one out of every three reads.[4] There is no dispute that in November 2002, the Broder Group reduced the number of reads allocated to the Kessler Group to approximately ten to fifteen percent of all reads, and that since December 2002, the Broder Group has ceased allocating reads to the Kessler Group altogether.

¶ 3 On November 27, 2003, the Kessler Group filed a complaint and a petition for an injunction and appointment of a custo-

1. George J. Broder, M.D., Michael R. Clair, M.D., William H. Hartz, M.D., Phillip J. Moldofsky, M.D., and Jay S. Rosenblum, M.D., comprise the Broder Group.

2. Those corporations are Delaware Open MRI Radiology Associates, P.A., County Line Open MRI, Inc., Andorra Open MRI, Inc., and Jeanes Radiology Associates, P.C., which has an unincorporated division, also a defendant, named Pennsylvania Open MRI at Grant Plaza.

3. Howard B. Kessler, M.D., Andrew H. Shaer, M.D., and Lock W. Barber, D.O., comprise the Kessler Group.

4. The Kessler Group collectively owns approximately 37.5 percent of the shares of the defendant corporations and the Broder Group collectively owns approximately 62.5 percent of the shares.

dian against the Broder Group and the defendant corporations. The trial court held a hearing on the petition, and on January 9, 2003, entered an Order granting it in part, and denying it in part. It ordered, *inter alia*, that appellants make available to appellees the corporate books and records and denied the request for a custodian. The court held under advisement the request to enjoin the distribution of MRI reads inconsistent with the distribution prior to November 2002, until the results of financial examinations were published.

¶ 4 The trial court held another hearing on the petition on May 13, 2003, and entered a mandatory, preliminary injunction requiring appellants to allocate one-third of the MRI reads to appellees commencing on June 2, 2003, and requiring appellees to post a bond for $70,000. On May 20, 2003, appellants appealed seeking expedited relief. On June 19, 2003, the trial court denied appellants' petition for reconsideration or a stay of preliminary injunction pending appeal. By our July 10, 2003 Order, this Court granted appellants' emergency application for supersedeas and directed the trial court to file an Opinion, which the trial court did on July 28, 2003.

¶ 5 Appellants raise the following issues in this appeal.

1. Did the trial court err in entering a mandatory preliminary injunction requiring defendants to assign MRI readings to plaintiffs' physicians where the only injury proven by plaintiffs was the loss of readily-calculable revenue that plaintiffs otherwise would have earned by performing those readings?

2. Did the trial court err in entering a mandatory preliminary injunction requiring defendants to assign MRI readings to plaintiffs' physicians where (a) the only radiology services contracts between the parties did not require those assignments and (b) the ultimate financial beneficiary of the assignments would be plaintiffs' separately-owned, third party corporation?

3. Did the trial court err in entering a mandatory preliminary injunction requiring defendants to assign a fixed percentage of MRI readings to plaintiffs' physicians where the status quo had been that MRI readings were assigned on the basis of practical business considerations, not according to the percentage of plaintiffs' collective ownership interests?

4. Did the trial court err in entering a mandatory preliminary injunction requiring defendants to assign MRI readings to plaintiffs' physicians where plaintiffs stood to gain only additional revenue but where plaintiffs' performance of the MRI readings threatens to disrupt the operation of the parties' MRI Centers?

Appellants' brief at 6.

¶ 6 Our Supreme Court recently restated the standard of review applicable to the grant or refusal of a preliminary injunction. *See Summit Towne Centre, Inc. v. Shoe Show of Rocky Mt., Inc.*, 573 Pa. 637, 828 A.2d 995 (2003). Generally, appellate inquiry is limited to a determination of whether an examination of the record reveals that "any apparently reasonable grounds" supports the trial court's disposition of a preliminary injunction request. *Id.*, at 646, 828 A.2d at 1001. The standard of review differs, however, where, as here, the trial court has granted a *mandatory* preliminary injunction. *See id.*, note 7. Such a remedy is extraordinary and should be utilized only in the rarest of cases. *See id.*, note 13. Our Supreme Court has deviated from the general standard applicable to

review of preliminary injunctions, *only* when reviewing the grant of a mandatory preliminary injunction. *See Mazzie v. Commonwealth,* 495 Pa. 128, 134, 432 A.2d 985, 988 (1981). The *Mazzie* Court explained:

> Generally, preliminary injunctions are preventive in nature and are designed to maintain the status quo until the rights of the parties are finally determined. There is, however, a distinction between mandatory injunctions, which command the performance of some positive act to preserve the status quo, and prohibitory injunctions, which enjoin the doing of an act that will change the status quo. This Court has engaged in greater scrutiny of mandatory injunctions and has often stated that they should be issued more sparingly than injunctions that are merely prohibitory. *Thus, in reviewing the grant of a mandatory injunction, we have insisted that a clear right to relief in the plaintiff be established. However, since the preliminary injunction appealed from in this case is merely prohibitory, we will not review the merits of the controversy but will only determine if there were any apparently reasonable grounds to support that action and will reverse only if no such grounds exist.*

*Id.* (citations omitted and emphasis supplied.)

■ ¶ 7 As the above elucidates, in reviewing the grant of a mandatory preliminary injunction we must examine the merits of the controversy and ensure that "a clear right to relief in the plaintiff [is] established." *See Id.* With this standard in mind we begin our review.

■ ¶ 8 A petitioner seeking a preliminary injunction must establish every one of the following prerequisites; if the petitioner fails to establish any one of them, there is no need to address the others. *Summit Towne Centre, supra,* at 646, 828 A.2d at 1001, *citing County of Allegheny v. Commonwealth,* 518 Pa. 556, 560, 544 A.2d 1305, 1307 (1988).

> First, a party seeking a preliminary injunction must show that an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages. Second, the party must show that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings. Third, the party must show that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct. Fourth, the party seeking an injunction must show that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits. Fifth, the party must show that the injunction it seeks is reasonably suited to abate the offending activity. Sixth and finally, the party seeking an injunction must show that a preliminary injunction will not adversely affect the public interest.

*Summit Towne Centre,* at 646–647, 828 A.2d at 1001.[5]

¶ 9 We begin by addressing the fourth prerequisite to issuance of an injunction petition, i.e. that the petitioner must show the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other

---

5. We will address the issues appellants raise on appeal not in the order in which they are raised, but rather where appropriate, as we analyze the prerequisites to the issuance of an injunction petition.

words, that it is likely to prevail on the merits. *See Valley Forge Historical Soc. v. Washington Memorial Chapel,* 493 Pa. 491, 500, 426 A.2d 1123, 1128 (1981) (stating that even more essential than the first three prerequisites is the determination that the activity sought to be restrained is actionable, the right to relief is clear, and the wrong manifest); *see also S.D. Bowers, Inc. v. National Bank of Commonwealth,* 404 Pa.Super. 512, 591 A.2d 324 (1991).

¶ 10 In their petition, appellees based their claim for relief upon two theories, the first is breach of an oral agreement, pursuant to which they say reads from the parties' MRI centers were to be allocated according to the groups' respective ownership interests in the centers. Their second theory is breach of fiduciary duties. Appellees claim appellants breached the oral agreement and their fiduciary duties by failing to distribute the reads in accordance with their agreement and with the "usual course and conduct of the parties' relationship." Complaint at 10–11. Although the trial court discussed appellees' allegation of an oral agreement, and the parties' course of conduct, *see* Trial Court Opinion at 3, it did not discuss the issue of fiduciary duties, and it failed to specify the basis upon which it concluded appellees are entitled to relief. We must determine whether appellees produced substantial, credible evidence in support of their claims. *See Santoro v. Morse,* 781 A.2d 1220, 1229 (Pa.Super.2001), citing *Lewis v. City of Harrisburg,* 158 Pa.Cmwlth. 318, 631 A.2d 807 (1993).

¶ 11 Upon a thorough review of the record we conclude a clear right to relief has been established in appellees since we find substantial, credible evidence in support of their claim that appellants breached their fiduciary duties by ceasing entirely all allocation of reads to appellees.

It is axiomatic that majority shareholders have a duty not to use their power in such a way to exclude minority shareholders from their proper share of benefits accruing from the enterprise. The aforementioned principle does not mean that majority shareholders may never act in their own interest, but when they do act in their own interest, it must also be in the best interest of all shareholders and the corporation. Pennsylvania law holds that an attempt by a group of majority shareholders to "freeze out" minority shareholders for the purpose of continuing the enterprise for the benefit of the majority shareholders constitutes a breach of the majority shareholders' fiduciary duty to the minority shareholders.

*Viener v. Jacobs,* 834 A.2d 546, 556 (Pa.Super.2003) (citations omitted).

¶ 12 To understand how the majority shareholders here have acted to "freeze out" the minority shareholders, it is necessary to clarify the functions of the various entities involved. Each member of the Kessler and Broder groups are shareholders in the MRI centers, which are corporate entities. The Kessler Group, with three radiologists, collectively owns 3/8 of the corporate shares and the Broder Group, with five radiologists, collectively owns 5/8 of the shares. Each group has a professional corporation which employs the radiologists. The MRI centers create MRI's, which then need to be read by a radiologist. Dr. Michael R. Clair, as a medical director of the MRI Centers, allocates the MRI's to one of the professional corporations to be read by one of the radiologists. The professional corporation bills the MRI centers for the reads. This creates an expense to the commonly owned MRI centers and revenue for the professional corporation which performs the read. *See* N.T., 1/3/03, at 22–27, 36.

¶ 13 Until December 2002, Dr. Clair, as a medical director of the MRI centers, allocated reads to both the Kessler Group's professional corporation and to the Broder Group's professional corporation. N.T., 1/3/03, at 19–20. Dr. Clair admitted, however, that from January 2002, he allocated approximately 30–35 percent of the reads to the Kessler Group;[6] in November 2002, he reduced this allocation to between 10–15 percent of reads; in December 2002, he allocated no reads to them; and since that time, with the agreement of the other majority shareholders, he has continued to allocate all reads to his group, the Broder Group. *Id.*, at 35–36, 86, 103, 119–121; N.T. 5/13/03, at 77, 81–84, 95–96. Although Dr. Clair further admitted that under this allocation, his group benefits by receiving all of the revenue for the MRI reads to the exclusion of the Kessler Group, he insists he did not allocate them in this manner for that reason, but instead because it benefited the MRI centers by centralizing the readings and because his group can allegedly do the reads more efficiently. N.T. 1/3/03, at 27–30. Dr. Clair also testified, however, that the MRI centers were not paying less for reads due to any alleged increase in efficiency. *Id.*, at 21–22, 29.

¶ 14 Further, although Dr. Clair testified availability was one of the most important criterion he considered in allocating reads, and even though Dr. Howard B. Kessler sent an email to the Broder Group offering for the Kessler Group to do reads at a lower cost than the Broder Group was charging the MRI centers, Dr. Clair knew Dr. Andrew H. Shaer was available for reads, and Dr. Shaer informed Dr. Clair that the Kessler Group had a "stable of readers available to read MRI's," Dr. Clair admitted he only considered the availability of his group. N.T., 1/3/03, at 86–87, 102; N.T., 5/13/03, at 13, 17, 77–78, 90, 129, 135–136, 143–148. Dr. Clair testified, moreover, that since the January 2003 hearing, he has made the decision to continue to allocate all reads to the Broder Group, because it was clear to him that the groups were ultimately going to separate. N.T., 5/13/03, at 79–80.

¶ 15 Noteworthy too is that in November of 2002, the Kessler Group contracted with Jeanes Hospital to provide radiology services. Prior to that time, the Broder Group, through an entity called Fox Chase Medical Center Radiology Associates, provided those services to the hospital. Complaint, page 6, paragraph 20; *see also* Trial Court Opinion, at 3. In a related lawsuit, the Fox Chase Medical Center Radiology Associates filed a complaint against the Kessler Group in which it contends the Kessler Group improperly obtained a competitive advantage over them. N.T., 1/3/03, at 32; N.T., 5/13/03, at 149. Dr. Clair testified the Broder Group lost $2.5 million in revenue, or 40 percent of its total revenue, as a result of losing the Jeanes Hospital contract to the Kessler Group. N.T., 1/3/03, at 128.

¶ 16 Interestingly, the Kessler Group was awarded the Jeanes Hospital contract in November 2002, and, as previously noted, Dr. Clair reduced the reads allocated to Dr. Shaer that same month, and then stopped allocating reads to him altogether in December 2002. Also around this same time, the Broder Group voted the Kessler Group off of the boards of directors on which they served, stopped giving the Kessler Group monthly financial information as it had done for the past three years, stopped paying Dr. Shaer his medical di-

___

**6.** Dr. Andrew H. Shaer was the only member of the Kessler Group to whom reads were allocated. N.T., 1/3/03, at 21.

rector fee, and stopped paying distributions to any shareholders. *Id.,* at 32–35. Dr. Clair testified that while all of the actions corresponded chronologically to the Kessler Group's acquisition of the Jeanes Hospital contract, they were unrelated to it. *Id.,* at 35. As a result of losing the contract, Dr. Clair explained the Broder Group can focus its time on the MRI reads, and simply has no need to allocate reads to the Kessler Group. N.T. 5/13/03, at 124, 150. He admitted, however, that in five years, until January 2003, the Kessler Group had never gotten zero reads. *Id.* at 162. We agree with the trial court that "there's more of a nexus between whatever went down when [the Kessler Group] got a little too close to [the Broder Group] competitively with Jeanes...." N.T., 1/3/03, at 46.

■ ¶ 17 Based on our review of the record, we find there is substantial and credible evidence that Dr. Clair's decision to allocate zero reads to the Kessler Group was made in the interest of the Broder Group and not for the good of all shareholders. That evidence indicates the majority shareholders have acted to "freeze out" the minority shareholders for their own benefit. Doing so is a breach of the majority shareholders' fiduciary duty. *See Viener, supra.* Accordingly, we find that appellees have established a clear right to relief.

■ ¶ 18 Appellants also complain appellees are not entitled to relief since the parties' radiology services contracts afforded the medical director unfettered discretion in allocating the reads.[7] Appellants' brief at 27–30. We are unable to locate these contracts in the record and although appellants direct us to the copies of those contracts in the reproduced record, we remind appellants,

> [i]t remains the appellant's responsibility to ensure that a complete record is produced for appeal. Inclusion in the reproduced record is not an acceptable substitute for the original certified record. The failure of the appellant to ensure that the original record certified for appeal contains sufficient information to conduct a proper review may constitute a waiver of the issues sought to be examined.

*Stewart v. Owens–Corning Fiberglas,* 806 A.2d 34, n. 3 (Pa.Super.2002) (citations omitted). We note, however, that appellants cite to paragraph 2.1.2 of one of these agreements, which they assert provides MRI readings may be furnished by any radiology physician as determined by the parties' medical director, i.e., Dr. Clair. *See* Appellants' brief at 28. We find this provision does not license the majority shareholders to act only for their benefit, to the detriment and exclusion of the minority shareholders, and thereby breach their fiduciary duties, as we have concluded is the case here.

¶ 19 Finally on this issue, appellants contend appellees are not entitled to relief since there is no right in a minority shareholder to provide services to the corporation; and here they say, the ultimate financial beneficiary of the assignments would be appellees' separately-owned, third party corporation.[8] In our holding, we have not created such a right in minority shareholders. We have found only that in the circumstances at issue here, the majority shareholders have breached their fiduciary duties by acting solely for their own benefit and to the exclusion and detriment of the minority shareholders.

---

7. This is appellants' second issue on appeal.

8. This is the second component of appellants' second issue on appeal.

¶ 20 We now consider the first prerequisite to the issuance of a preliminary injunction, i.e. whether the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages. Appellants challenge the trial court's holding on this issue, arguing that appellees' loss of MRI reading revenue is fully compensable by money damages. They further contend the trial court's conclusion that appellees were threatened by an impending loss of unquantifiable referral business was based solely on speculation since, *citing Summit Towne Centre, supra,*[9] they say appellees failed to present any concrete evidence to this effect.[10]

¶ 21 In *Summit Towne Centre,* a corporation owned a shopping center and leased to tenants. When a tenant vacated the premises prematurely, the lessor corporation sought a preliminary injunction to force the tenant to reopen the store. The Supreme Court reversed this Court and affirmed the trial court's denial of the injunction, since it found "apparently reasonable grounds" in the record supporting the trial court's denial. It found, *inter alia,* that the lessor had an adequate remedy at law since the lease contained a liquidated damages clause specifically for the event the tenant vacated the premises prematurely. Further, the Supreme Court found the lessor provided no concrete evidence of harm such as data relating to other stores' lost sales, or increased vacancy rates to support the lessor's contention that the center was an "economically interdependent unit that suffers a 'domino effect' of harm when one tenant vacates in violation of the lease." *Id.,* at 644, 828 A.2d at 999. Since the Supreme Court

concluded the lessor's allegations of harm were based almost entirely on speculation and hypothesis, it therefore found no proof of immediate and irreparable harm. It reiterated that "actual proof of irreparable harm is required." *Id.,* at 649, 828 A.2d at 1002–1003, *citing New Castle Orthopedic Associates v. Burns,* 481 Pa. 460, 392 A.2d 1383, 1387 (1978).

¶ 22 Extant case law makes clear that the impending loss of a business opportunity or market advantage may aptly be characterized as an "irreparable injury" for this purpose, i.e. for the purpose of a preliminary injunction. *Santoro, supra,* at 1228.[11] While there can be no doubt that the Kessler Group suffered a current, pecuniary loss as a result of the Broder Group's actions, the question is whether sufficient evidence exists from which we can conclude that the Broder Group's actions will result in the loss of a business opportunity or market advantage. Testimony in this case from both sides, as well as common experience, leaves no question that there are "referral patterns," N.T., 5/13/03, at 40, 86, 138, i.e., physicians tend to refer cases to the physicians to whom they have referred previously. Dr. Shaer testified physicians referred to him based on continuity of referrals and his reputation. *Id.,* at 40. Further, he testified that referring physicians noticed he was doing very few reads. *Id.,* at 24. Clearly the continuity of referrals to him was disrupted. Significantly moreover, as the trial court noted, the two groups have been in competition with each other for a substantial period of time, N.T., 1/3/03, at 7. The Kessler Group's inability to perform any of the reads, therefore, could hinder its future capacity to compete in the market,

9. *Summit Towne Centre, Inc. v. Shoe Show of Rocky Mt., Inc.,* 573 Pa. 637, 828 A.2d 995 (2003).

10. This is appellants' first issue on appeal.

11. *Santoro v. Morse,* 781 A.2d 1220, 1229 (Pa.Super.2001).

hence providing the Broder Group with a market advantage.

¶ 23 Based upon the above, we find there is sufficient evidence upon which to conclude the Kessler Group likely could suffer the impending loss of a business opportunity or market advantage. Moreover, unlike *Summit*, here there is no liquidated damages agreement upon which to base a monetary award. We conclude that since the resulting harm is "inherently unascertainable, and hence incapable of being fully compensated by money damages," the harm to appellee is irreparable, *see Santoro, supra* at 1228, and it cannot be compensated by money damages alone.

¶ 24 As to the second prerequisite to issuance of a preliminary injunction, i.e., that the petitioner must prove that greater injury would result from refusing the injunction than from granting it and that issuance of an injunction will not substantially harm other interested parties in the proceedings, appellants argue more harm will come from granting the petition since they contend the Kessler Group stands only to gain additional revenue whereas the Kessler Group's performance of MRI reads threatens to disrupt the operation of the parties' MRI Centers.[12]

¶ 25 The trial court concluded,

[t]he injunction will restore the parties to the status quo as it existed immediately before the Broder Group ceased giving reads to the Kessler Group. The Order to assign one-third of the MRI reads to the Kessler Group reestablishes the allocation of approximately thirty-three percent of all reads to the Kessler Group that the Broder Group had made between January 2002 and August 2002. ... [T]he court finds that the Broder Group's action in not giving reads to the Kessler group is manifest, the injunction

is reasonably suited to abate it, and the Kessler Group's right to relief is clear. Further, the court finds that greater injury would occur from denying the injunction than from granting it. Even though the injunction will result in the Broder Group not receiving one hundred percent of the revenue derived from the reads, the Kessler Group will not suffer immediate and irreparable harm to its business opportunity and market advantage, the reads will be performed competently and efficiently, and the co-owned entities will still derive income from the reads.

Trial Court Opinion at 9 (footnote omitted). We agree. Among the evidence supporting this finding is that Dr. Clair himself testified Dr. Shaer is a qualified and competent radiologist, N.T., 1/3/03, at 16; and, in terms of availability, an important criterion to Dr. Clair, the Kessler Group has made clear they have many radiologists available to perform the reads. N.T., 5/13/03, at 13, 17, 77–78, 90, 129, 135–136, 143–148.

¶ 26 Moreover, we find appellants' claim that the Kessler Group's performance of MRI reads threatens to disrupt the operation of the parties' MRI Centers is tenuous. It is based on the trial court's conclusion that the parties cannot work together in the future and appellants' complaint that the Kessler Group is "engaged in open competition with [the co-owned MRI] centers." *See* Trial Court Opinion at 9, n. 6; *see also* appellants' brief at 36–37. We simply note that it is clear the parties have been in open competition with each other for quite some time. N.T., 1/3/03, at 7. Also, it is clear that the parties maintain separate offices and so their interaction is limited. *Id.*, at 36–41. While, as indicated *supra*, Dr. Clair insists that centralization

12. This is appellants' fourth issue on appeal.

and efficiency are critical, the MRI centers are not paying any less for reads due to this centralization of the reads. In fact, Dr. Kessler has offered for his group to perform reads at a lower price than that which the Broder Group charges. N.T., 5/13/03, at 147–148. The MRI centers therefore, will likely further benefit from an allocation of reads to the Kessler Group. Accordingly, we reject appellants' argument in this regard.

¶ 27 As to the third prerequisite to the grant of a preliminary injunction, i.e., that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct, appellants argue that the status quo was not that reads were allocated based upon ownership interests, so that the Kessler Group was to be allocated one out of every three reads, but rather they were allocated based upon practical business considerations, as Dr. Clair insisted in his testimony.[13] *See* N.T., 1/3/03, at 18.

¶ 28 The record reveals that from January 2002 through October 2002, the Kessler Group was allocated approximately 35 percent of the reads. In November 2002 this was reduced to approximately 10–15 percent and then allocation to the Kessler Group ceased altogether. N.T. 1/3/03, at 36, 86, 103, 119–121. The Kessler Group complains of appellants' conduct beginning in November 2002. Complaint at 2. The status quo for almost a year prior to that conduct was assignment of approximately 35 percent of the reads to the Kessler Group. Accordingly, we find the preliminary injunction properly will restore the parties to their status as it existed immediately prior to the alleged wrongful conduct.

13. This is appellants' third issue on appeal.

¶ 29 Having found the first four prerequisites are satisfied, we also find the fifth prerequisite is satisfied in that the injunction is reasonably suited to abate the offending activity since the offending activity is the assignment of no reads to the Kessler Group. As to the sixth and final prerequisite, we have no reason to believe the injunction will adversely affect the public interest.

¶ 30 In sum, we conclude this is one of the rare instances in which a mandatory preliminary injunction is appropriate.

¶ 31 Order affirmed.