J-A04018-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| CENTENNIAL LENDING GROUP, LLC | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| SECKEL CAPITAL, LLC | |
| Appellant | No. 822 EDA 2016 |

Appeal from the Order Entered February 12, 2016
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): October Term, 2015 No. 01023

BEFORE: SHOGAN, J., SOLANO, J., and PLATT, J.[*]

MEMORANDUM BY SOLANO, J.:                    **FILED OCTOBER 26, 2017**

Appellant, Seckel Capital, LLC, appeals from the order granting a preliminary injunction in favor of Appellee Centennial Lending Group, LLC on its claim of unfair competition. We conclude the record supports the trial court's issuance of a preliminary injunction; but because the trial court failed to order the filing of a bond, we are constrained to vacate the order and remand with instructions to reissue the preliminary injunction with a bond requirement.

In October 2015, Centennial sued Seckel, presenting claims for misappropriation of trade secrets under the Pennsylvania Uniform Trade Secrets Act ("PUTSA"),[1] conversion, tortious interference with contract,

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] **See** 12 Pa.C.S. §§ 5301-5308.

aiding and abetting breach of a fiduciary duty, unfair competition, and tortious interference with business relations. Centennial also moved for a preliminary injunction. Centennial requested an order mandating (1) the return and destruction of confidential information of Centennial that was in the possession of Seckel, (2) that Seckel be enjoined from acquiring more of Centennial's confidential information, and (3) that Seckel be prohibited from soliciting Centennial's employees for employment. Trial Ct. Op. at 2.

The court held a two-day evidentiary hearing on the motion on February 3-4, 2016, at which the following was established.

Susan Meitner is the president and chief executive officer of Centennial, a residential mortgage broker whose potential customers include potential borrowers and referral sources — that is, prior customers and real estate agents acting to buy or sell a home. N.T., 2/4/16, at 9, 65-66. When Centennial first began operations, it did not have its employees sign any agreements addressing confidentiality. *Id.* at 79. Subsequently, in 2013, Centennial asked some of its then-current employees, including Celeste Spadaccini,[2] one of Centennial's loan officers, to acknowledge receipt of a handbook with a confidentiality provision and to sign a document with a confidentiality clause. *Id.* at 80; R.R. at 28a-29a.[3]

---

[2] Her last name is spelled differently throughout the record; we use the spelling reflected in her affidavit. R.R. at 196a.

[3] Seckel describes this document as an unenforceable employment agreement, Seckel's Brief at 21; Centennial calls it an "Origination Plan" that
*(Footnote Continued Next Page)*

John Seckel is the president of Seckel Capital, another mortgage broker. During the summer and fall of 2015, Centennial had twenty-two loan officers. N.T., 2/3/16, at 45; R.R. at 913a. That summer, Seckel hired six of Centennial's loan officers and one of its loan processors. N.T., 2/4/16, at 26, 131. Mr. Seckel personally recruited two of those loan officers and reached out to others at Centennial. *Id.* at 125-26. The six loan officers hired by Seckel comprised almost 30% of Centennial's loan officers. Additionally, after Centennial "let go" two other loan officers, Seckel hired them. *Id.* at 49, 131. Mr. Seckel also interviewed three other Centennial employees, including a loan officer, but decided not to hire them. *Id.* at 138-39. As discussed in further detail below, Mr. Seckel also interviewed and offered a job to Spadaccini, who declined the offer. Centennial contends that it lost $500,000 in the fourth quarter of 2015, after $70 million of its business went to Seckel as a result of Seckel's hiring of its employees. *Id.* at 58-59.

Ed Walsh, a Seckel vice president and branch manager, is one of the six former Centennial loan officers who was hired by Seckel. Shortly after midnight on February 4, 2016, the second day of the hearing, Walsh e-mailed Meitner and Steven Winokur, another Centennial employee, from his non-work account. N.T., 2/4/16, at 64-65, 68. The e-mail stated that if

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
it uses "for the purpose of providing meaning and market competitive financial rewards" for its loan officers. R.R. at 28a.

Centennial did not pay Walsh compensation to which he claimed to be entitled, Walsh would destroy Centennial:

> The clock is ticking. You have 3 days to pay me in full or i will unleash the wolves. My money is too long for you. Time is to short I will destroy your company....Period pay what you owe or its game over. I have more in cash in my fucking safe, then your entire family has all in. Wrong man to play games with. Pay what you owe or it game over. Final warning I'm undefeated in court!!!!

Centennial's Ex. 59; R.R. at 964a (punctuation and spelling as in original).[4]

That same morning of February 4, 2016, Walsh also posted on his Facebook[5] page: "FYI, if you burn me, I will destroy you, period. Money is long. Time is short, and it did say CLG [Centennial] tick-tock to [*sic*]." N.T., 2/4/16, at 70.[6] Meitner is not a Facebook "friend" with Walsh, but Meitner's

---

[4] Later that day, at the preliminary injunction hearing, Meitner read a sanitized version of the e-mail into the record. N.T., 2/4/16, at 67-68. We note that none of the exhibits introduced at the hearing were transmitted to this Court as part of the certified electronic record. However, the exhibits were made part of the reproduced record and no party has challenged their authenticity.

[5] Facebook is a social networking website on which "[u]sers of that Web site may post items on their Facebook page that are accessible to other users, including Facebook 'friends' who are notified when new content is posted." **Elonis v. United States**, ___ U.S. ___, 135 S. Ct. 2001, 2004 (2015). A user may make a posted item viewable by any user of Facebook or only to such selected users as their Facebook "friends." A user may also edit an item after posting it. **See Daison v. Loudoun Cty. Bd. of Supervisors**, ___ F. Supp. 3d ___, 2017 WL 3158389, *2 (E.D. Va. 2017); Facebook, "How do I edit a post that I've shared from my Page?," *https://www .facebook.com/help/1376303972644600* (as accessed on Oct. 25, 2017).

[6] It appears that Walsh later edited the Facebook post to remove the reference to Centennial ("CLG"), as a printout of the post states, "Just a FYI!
*(Footnote Continued Next Page)*

assistant viewed the post and notified her of its content. N.T., 2/4/16, at 70.[7]

A portion of the hearing was devoted to Seckel's attempt to hire Spadaccini and to gain access to Centennial information on Spadaccini's laptop computer. Centennial typically issued laptops to its mortgage brokers. N.T., 2/4/16, at 114. A broker could electronically store a summary of a customer's personal and financial information for networking and potential future business purposes in a customized database accessible on the laptop through software named "Encompass". *Id.* at 104; N.T., 2/3/16, at 72-73; R.R. at 27a, 196a, 215a. The laptop also could be used to access Centennial's customer relationship management software, called "Mortgage Returns," in which a broker could enter customer names and other personal information, such as birthdays, for marketing purposes. N.T., 2/3/16, at 21, 86; N.T. 2/4/16, at 112; R.R. at 321a-22a. The programs appear to be integrated with each other, and information is easily shared between the two. Ex. 1, Suppl. Decl. of Meitner, at ¶ 11, 11/13/15, to

---

*(Footnote Continued)*

If you burn me, I will destroy you! Period! Money is long, time is short!!! Tick tock." Centennial's Ex. 60; R.R. at 966a.

[7] After the hearing, the record reflects that Walsh, on February 9, 2016, e-mailed Meitner and Winokur an apology for his "unprofessional email" and disclaiming any intent to destroy Centennial. R.R. at 985a. The e-mail also asserted that "John Seckel had no idea I wrote that e-mail and it is by no means a representation of Seckel Capital." *Id.*

Centennial's Reply Brief in Further Supp. of Centennial's Pet. for a Special and/or Prelim. Inj., 11/19/15, R.R. at 322a.

In late August and early September of 2015, Seckel contacted Spadaccini and extended a job offer to her, which Spadaccini initially accepted (though she later changed her mind and rejected the offer). N.T., 2/4/16, at 98-99, 101. Spadaccini met with Mr. Seckel and Nabil Farhat, Seckel's chief financial officer. At that meeting, Spadaccini expressed concern that she would be unable to start working for Seckel immediately "because it would be very labor-intensive to extrapolate four years of business. I had four of my best years at Centennial Lending. I closed $125 million of business. To pull all of that documentation out, I was a little concerned that I wouldn't be able to do it." *Id.* at 103. Spadaccini was referring to the customer relationship information that she accumulated at Centennial. *Id.* at 104. According to Spadaccini, Farhat suggested that if she brought her laptop, Seckel would be able to extract the information from Encompass. *Id.* at 103, 106.

A few days later, Spadaccini again met with Farhat, and she brought her laptop with her. N.T., 2/4/16, at 106; R.R. at 286a. At that second meeting, Spadaccini used her password to sign into Encompass, and Farhat used the laptop to "create those reports," N.T., 2/4/16, at 106, that is, the spreadsheets containing the customer information. Spadaccini's laptop was used to e-mail the spreadsheet reports from Spadaccini's personal e-mail account to Mr. Seckel. *Id.* at 107; *see* Exs. 4 & 5 to Centennial Ex. 44, R.R.

at 930a-50a (copies of the e-mails and spreadsheet reports at issue).[8]

Spadaccini denies personally sending those e-mails, however. N.T., 2/4/16, at 120. Mr. Seckel testified that the reports he received contained Spadaccini's customer list. *Id.* at 144.[9] Mr. Seckel also testified that although he deleted the e-mails upon receiving them, he was able later to recover the deleted e-mails. *Id.* at 155; R.R. at 917a-18a.

On February 12, 2016, the trial court issued an injunction that included the following terms:

1. Seckel shall not solicit employees of Centennial, until the conclusion of this action.

2. This Order does not prevent employees of Centennial from applying for employment at Seckel.

3. If such an employee is hired, Seckel shall contact counsel for both parties immediately upon the acceptance of an offer of employment, so that both parties can manage the transition of the employee and of any information.

---

[8] The reports were also downloaded to Spadaccini's computer, her personal cloud storage, or both (the record is imprecise). *See* N.T., 2/4/16, at 105, 156; R.R. at 917a. "Cloud storage is a method of storing electronic data on remote servers — in addition to or in lieu of the device itself. Data stored in the cloud can be accessed by an electronic device connected to the Internet." *Wertz v. State*, 41 N.E.3d 276, 285 n.8 (Ind. Ct. App. 2015).

[9] Centennial has not moved to seal Spadaccini's customer list, which is present in the filed hardcopy of the reproduced record and the electronic record transmitted to this Court.

Order, 2/12/16. The order did not restore Centennial's control over its confidential business records, including Spadaccini's customer list.[10] However, Seckel's counsel agreed to return that list to Centennial. N.T., 2/3/16, at 17-18.

Seckel timely appealed. The trial court filed an opinion on June 30, 2016, that briefly explained its rationale for granting injunctive relief. The court stated that the "injunction is designed to prevent disclosure of confidential records belonging to Centennial until the conclusion of a law case now at the pleading stage." Trial Ct. Op. at 1. It continued:

> Testimony at the preliminary injunction hearing made clear that Centennial has a likely chance of success at trial and that some of the actions Seckel has undertaken are manifestations of bad motive to permanently harm, if not destroy, Centennial's business. These actions included soliciting Centennial employees to divulge confidential information directly from computer hard drives and systematic solicitation of Centennial employees to leave [C]entennial, work for Seckel and then divulge their old company's confidential work product.
>
> . . .
>
> [T]he harm taking place is both immediate and irreparable. This injury cannot be compensated fully by monetary damages.
>
> . . .
>
> If followed, the order properly restores Centennial to its former control over its own confidential business records.[11]
>
> . . .

---

[10] Centennial has not filed a cross-appeal to challenge the court's injunctive relief as insufficiently tailored to restore the *status quo*.

[11] As noted above, the order did not contain provisions for restoration of such control to Centennial.

Centennial is entitled to equitable protection and the transcript record reveals worrisome animus by some Seckel personnel against Centennial's president.

Trial Ct. Op. at 2-3.

After Seckel appealed, Centennial filed an unopposed motion to set bond for the preliminary injunction. Seckel apparently agreed that the court must impose a bond. Centennial's Mot. to Set Bond for Preliminary Inj., 11/16/16, at 3 ("Counsel for Centennial has conferred with counsel for Seckel, who agrees that the Court must impose a bond requirement"). The court scheduled argument for June 19, 2017. After argument, without explaining its decision, the court denied the motion to set bond, without prejudice. Order, 6/22/17.

On appeal, Seckel raises the following issues:

1. Whether the trial court properly entered a preliminary injunction when Centennial . . . failed to present concrete evidence supporting that it would suffer irreparable harm if solicitation was not prohibited?

2. Whether the trial court proper[l]y entered a preliminary injunction when Centennial failed to establish that it had a likelihood o[f] . . . success o[n] the merits of its unfair competition claim?

3. Whether the trial court properly entered a preliminary injunction without requiring Centennial to post a bond?

Seckel's Brief at 3.

Our standard of review follows:

Our review of a trial court's order granting or denying preliminary injunctive relief is highly deferential. . . . [We] examine the record to determine if there were any apparently reasonable grounds for the action of the court below.

- 9 -

*WMI Grp., Inc. v. Fox*, 109 A.3d 740, 747-48 (Pa. Super. 2015).[12]  More

specifically:

> A trial court has apparently reasonable grounds for granting the extraordinary remedy of preliminary injunctive relief if it properly finds that all of the essential prerequisites are satisfied.
>
>> There are six essential prerequisites that a party must establish prior to obtaining preliminary injunctive relief. The party must show: 1) that the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages; 2) that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings; 3) that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct; 4) that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits; 5) that the injunction it seeks is reasonably suited to abate the offending activity; and, 6) that a preliminary injunction will not adversely affect the public interest. The burden is on the party who requested preliminary injunctive relief.

---

[12] We have explained:

> It is somewhat embarrassing to an appellate court to discuss the reasons for or against a preliminary decree, because generally in such an issue we are not in full possession of the case either as to the law or testimony — ***hence our almost invariable rule is to simply affirm the decree***, or if we reverse it to give only a brief outline of our reasons, reserving further discussion until appeal, should there be one, from final judgment or decree in law or equity.

*WMI Grp.*, 109 A.3d at 743 n.2 (citation omitted and emphasis in original).

. . . Simply, the moving party must establish a *prima facie* right to relief. If the moving party's right to relief is unclear, then a preliminary injunction should not issue.

***Synthes USA Sales, LLC v. Harrison***, 83 A.3d 242, 249-50 (Pa. Super. 2013) (citations, quotation marks, and footnote omitted). Seckel's issues contest only the first and fourth prerequisites.

### Irreparable Harm

In justifying the injunction, the trial court inferred irreparable harm from Seckel's past actions, which "included soliciting Centennial employees to divulge confidential information directly from computer hard drives and systematic solicitation of Centennial employees to leave [C]entennial, work for Seckel and then divulge their old company's confidential work product." Trial Ct. Op. at 2. In evaluating the trial court's assessment of irreparable harm, we apply the aforementioned deferential standard of review. ***WMI Grp.***, 109 A.3d at 747-48; ***accord, Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount, Inc.***, 828 A.2d 995, 1000-01 (Pa. 2003).

In challenging Centennial's showing of irreparable harm, Seckel begins with the premise that a preliminary injunction should issue only if the "threatened monetary loss is so great as to threaten the existence of the business." Seckel's Brief at 12 (quoting ***Three County Servs., Inc. v. Phila. Inquirer***, 486 A.2d 997, 1001 (Pa. Super. 1985)). Seckel points out that the court's order did not instruct Seckel to return or destroy any allegedly misappropriated Centennial documents. ***Id.*** The order also did not prohibit Seckel from using such documents. ***Id.*** Thus, according to Seckel,

the trial court's opinion "suggests that [it] found that irreparable harm would be caused by the hiring of additional employees of Centennial who were not restricted from taking unspecified documents from Centennial." *Id.* at 13.

Building on that suggestion, Seckel contends that Centennial failed to adduce sufficient evidence of monetary loss from Seckel's past hiring of 30% of Centennial's loan officers. Seckel's Brief at 13. In Seckel's view, Centennial's contention that it lost $500,000 in the fourth quarter of 2015, after $70 million of business went to Seckel, is in tension with Centennial's assertion, in one of its pleadings, that Centennial was one of the "fastest growing private companies in America." *Id.* at 14 (citing R.R. at 376a).

Seckel then shifts to whether irreparable harm could flow from any use of Spadaccini's customer list.[13] Seckel's argument necessarily presumes that the customer list is a trade secret, though Seckel does not concede that point. Seckel argues:

> If before a trial on the merits, Seckel makes a mortgage loan to any person listed on a customer list that is determined to be improper, then Centennial can easily prove that Seckel made a loan to such customer and calculate the lost revenues from any such loan. Given that most customers do not come back for a new mortgage loan for five to ten years, it is unlikely that there could be a large quantity of loans that Seckel could make using any allegedly improperly obtained customer list. Thus, the use of Ms. Spadaccini's customer list until that case goes to trial, could not cause Centennial to go out of business . . . .

_____

[13] For ease of discussion, we refer to the customer list as "Spadaccini's" list. At trial, the parties may resolve whether the information in that list qualifies as a Centennial trade secret or belongs to Spadaccini.

Seckel's Brief at 14. Therefore, according to Seckel, "the alleged harm Centennial would suffer if Seckel solicited its employees or hired its employees without restricting what documents the employees could take, can be adequately compensated by money damages," and no preliminary injunction should have issued. *Id.* at 15.

Centennial counters that it introduced evidence that Seckel actively recruited almost 30% of its sales force, which directly resulted in reduced revenue. Centennial's Brief at 14. Centennial emphasizes that Seckel's chief financial officer obtained confidential information from Spadaccini's laptop. *Id.* at 14-15. Thus, Centennial reasons that because its loss is more than solely a monetary loss, Seckel's reliance on *Three County Servs.*, is misplaced. *Id.* at 16. Centennial posits that the facts of this case are more akin to *Kessler v. Broder*, 851 A.2d 944 (Pa. Super. 2004), in which we recognized that under existing case law, "the impending loss of a business opportunity or market advantage may aptly be characterized as an 'irreparable injury' for . . . the purpose of a preliminary injunction." *Id.* (quoting *Kessler*, 851 A.2d at 951).[14] Centennial also points out that even

---

[14] In *Kessler*, a dispute arose between the majority and minority shareholders of corporations that reviewed magnetic resonance images ("MRIs"). *Kessler*, 851 A.2d at 945 & n.4, 948. MRI images need to be reviewed by radiologists, and, under an oral agreement, the majority shareholders were supposed to allocate about one-third of the MRI reviews to the minority shareholder. *Id.* at 945, 948. Because the majority shareholders failed to adhere to the allocation agreement, the trial court issued a mandatory preliminary injunction directing them to comply. *Id.* at 945. In doing so, the court rejected a defense argument that the plaintiffs
*(Footnote Continued Next Page)*

if the monetary loss is small, it "foreshadows the disruption of established business relations which would result in incalculable damage should the competition continue . . . ." ***Id.*** at 17 (quoting ***West Penn Specialty MSO, Inc. v. Nolan***, 737 A.2d 295, 299 (Pa. Super. 1999)).

In ***Nolan***, this Court observed that "the purpose sought to be achieved by the issuance of a preliminary injunction is the avoidance of irreparable injury or gross injustice until the legality of the challenged action can be determined." ***Nolan***, 737 A.2d at 299 (quotation marks and citation omitted). The Court affirmed the issuance of preliminary injunctive relief because, among other reasons, the defendant's departure from the plaintiff to work for a competitor damaged the plaintiff's existing customer relationships and substantially undercut the plaintiff's competitiveness. ***Id.*** We agreed that even if a monetary loss is small or unascertainable, irreparable injury nevertheless may result from the disruption of established customer relationships, as well as a potential loss of a business opportunity or market advantage. ***Id.***

Here, as in ***Nolan***, Seckel's contention that the monetary loss is relatively minimal or unascertainable does not negate the irreparable harm caused by its conduct. The harm flows from the disruption of established

_(Footnote Continued)_ ———————

failed to establish irreparable harm because their loss of revenue was "fully compensable by money damages," reasoning that the plaintiffs were entitled to an injunction because they were being inhibited from competing in the marketplace. ***Id.*** at 951-52. On appeal, we agreed with the trial court's reasoning in justifying injunctive relief. ***Id.*** at 953.

customer relationships and loss of potential business opportunities should improper competition continue. The record set forth above supports a conclusion that Seckel's hiring of almost one-third of Centennial's loan officers resulted in an immeasurable loss of business opportunities and market advantage.

We also note that irreparable harm will have resulted if Spadaccini's customer list is ultimately determined to be Centennial's trade secret.[15] Under the PUTSA, a "trade secret" is defined to include a "customer list," provided it is subject to, among other conditions, efforts to "maintain its secrecy." 12 Pa.C.S. § 5302. Injunctive relief may issue if there is an actual or threatened misappropriation of such a trade secret. *Id.* § 5303(a). "Misappropriation" is defined as either "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," or "disclosure or use of a trade secret of another without express or implied consent . . . ." *Id.* Notably, "use" is not a required element of either definition. *See id.*; *Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 712 (E.D. Pa. 2014).[16] The PUTSA's protection of trade secrets is a statutory mandate, and the Supreme Court

---

[15] The trial court has not yet decided whether the list is a protected trade secret and we therefore do not address that issue.

[16] "Although the decisions of federal courts are not binding on this Court, we may rely on them for guidance." *Cresci Const. Servs., Inc. v. Martin*, 64 A.3d 254, 258 n.7 (Pa. Super. 2013) (citation omitted).

has held "that where the offending conduct sought to be restrained through a preliminary injunction violates a statutory mandate, irreparable injury will have been established." **SEIU Healthcare Pa. v. Commonwealth**, 104 A.3d 495, 508 (Pa. 2014) (collecting cases).[17]

Our review of the record supports the trial court's conclusion that Seckel solicited Spadaccini, accessed her Centennial laptop to retrieve her customer list, and e-mailed the list to Mr. Seckel. N.T., 2/4/16, at 120.[18] Therefore, if Centennial can prove that Seckel's acquisition of Spadaccini's customer list violates the PUTSA, the requirement of irreparable injury

---

[17] In support of this holding, the Supreme Court cited the following authorities in **SEIU**:

> **Commonwealth v. Coward**, 489 Pa. 327, 414 A.2d 91, 98–99 (1980) (holding that where a statute prescribes certain activity, the court need only make a finding that the illegal activity occurred to conclude that there was irreparable injury for purposes of issuing a preliminary injunction); **Pennsylvania Public Utility Commission v. Israel**, 356 Pa. 400, 52 A.2d 317, 321 (1947) (holding that when the Legislature declares certain conduct to be unlawful, it is tantamount to calling it injurious to the public, and to continue such unlawful conduct constitutes irreparable injury for purposes of seeking injunctive relief); **Commonwealth ex rel. Corbett v. Snyder**, 977 A.2d 28 (Pa. Cmwlth. 2009) (affirming issuance of a preliminary injunction and finding that irreparable harm was presumed where there was a credible violation of the state consumer protection statute).

**SEIU Healthcare Pa.**, 104 A.3d at 508.

[18] We note a significant distinction between retrieving and saving the customer list for Spadaccini's own use and what was done here: e-mailing the customer list to Mr. Seckel, who presumably had no prior knowledge of Spadaccini's customers.

automatically will have been satisfied.  ***SEIU Healthcare Pa.***, 104 A.3d at 594-95.

**Likelihood of Success on Centennial's Unfair Competition Claim**

Seckel's initial premise is that Centennial failed to establish that Spadaccini's customer list was confidential or a trade secret.  Seckel's Brief at 17, 21.  Furthermore, Seckel argues, Centennial had no enforceable confidentiality agreement with its employees.  Seckel concedes that Spadaccini signed a confidentiality agreement over a year after Centennial hired her, but insists that a lack of consideration renders that agreement unenforceable.  ***Id.*** at 21.  Thus, it appears Seckel is arguing that no unfair competition claim could lie when the information at issue is not protected by a contract or other source of legal redress.  ***Id.*** at 17, 20-21.  Seckel bolsters its argument by summarizing the trial court's oral findings that it was unclear to the court whether the information at issue was confidential. ***Id.*** at 23-24.

Seckel argues that Centennial failed to demonstrate that it offered Spadaccini a job solely for the purpose of obtaining Centennial's customer list.  Seckel references Spadaccini's own testimony that she — not Seckel — wanted to bring the customer list and that Seckel did not hire her for the list. Seckel's Brief at 24-25.  Spadaccini was not aware, according to Seckel, whether she was subject to a confidentiality provision. ***Id.*** at 25.  Seckel argues that the record was unrebutted that it never asked any Centennial employee that Seckel hired to take away Centennial documents and bring

them to Seckel. *Id.* Seckel reiterates that Centennial has not established that Seckel (1) was aware of any alleged wrongdoing by any Centennial employee; (2) possessed or used any of Centennial's allegedly confidential information; and (3) hired Centennial's employees for the purpose of harming Centennial. *Id.* at 26. With respect to the last point, Seckel notes that it had interviewed but declined to hire three of Centennial's employees. *Id.*[19]

In response, Centennial notes that it presented six claims against Seckel, but that Seckel has limited its challenge to only the unfair competition claim. Centennial's Brief at 18. In Centennial's view, Seckel waived "[a]ny challenge to Centennial's likelihood of success on any [of] the five other claims that independently support the trial court's injunction." *Id.*[20] Further, Centennial maintains that the record established that Seckel "[s]ystematically induced" 30% of Centennial's employees to leave with the

_____

[19] Seckel acknowledges that one of its ex-Centennial employees, Walsh, exhibited hostility to Centennial over a pay dispute. But, citing to mid-trial commentary by the trial court (*see* N.T., 2/4/16, at 165-66), Seckel asserts that the trial court found that Walsh was arguing about a "personal matter" between Centennial and Walsh and that it would be a "stretch" to impute Walsh's actions to Seckel. Seckel's Brief at 26-27. We note that we are bound by the trial court's order and decision setting forth its reasoning, but not by commentary made before the parties completed and rested their cases.

[20] In reply, Seckel contends that the trial court's opinion "does not explicitly state to which causes of action the court's order was directed." Seckel's Reply Brief at 1. Seckel maintains that after a review of the transcript, "it is apparent" that the "court's finding of likelihood of success" was limited only to Centennial's unfair competition claim. *Id.* at 2.

purpose of crippling or destroying Centennial. *Id.* at 18-19. Centennial highlights Seckel's improper pursuit of Spadaccini and access of her Centennial laptop to obtain information that Centennial insists qualifies for trade secret status. *Id.* at 19, 22.

As set forth above, a court should issue a preliminary injunction only if the moving party has established, among other things, a *prima facie* right to relief. **Synthes USA Sales**, 83 A.3d at 249-50. The Court in **Synthes** explained:

> To establish a reasonable probability of success on the merits, the moving party must produce sufficient evidence to satisfy the essential elements of the underlying cause of action. Whether success is likely requires examination of legal principles controlling the claim and potential defenses available to the opposing party. The mere possibility that the claim might be defeated does not preclude a finding of probable success if the evidence clearly satisfies the essential prerequisites of the cause of action.

*Id.* at 250 n.4 (citation omitted).

Initially, we note that a common law unfair competition claim is relatively broad in scope and is not limited to the misappropriation of trade secrets. **Pennsylvania State Univ. v. Univ. Orthopedics, Ltd.**, 706 A.2d 863, 867 (Pa. Super. 1998) ("A claim of unfair competition encompasses trademark infringement, but also includes a broader range of unfair practices, which may generally be described as a misappropriation of the skill, expenditures and labor of another" (citation omitted)). In **Reading Radio, Inc. v. Fink**, 833 A.2d 199 (Pa. Super. 2003), **appeal denied**, 847 A.2d 1287 (Pa. 2004), this Court explained:

- 19 -

Offering employment to another company's at-will employee is not actionable in and of itself. However, systematically inducing employees to leave their present employment is actionable when the purpose of such enticement is to cripple and destroy an integral part of a competitive business organization rather than to obtain the services of particularly gifted or skilled employees. Further, when the inducement is made for the purpose of having the employees commit wrongs, such as disclosing their former employer's trade secrets or enticing away his customers, the injured employer is entitled to protection.

*Id.* at 212 (citations and quotation marks omitted) (affirming jury verdict finding defendant liable for, among other claims, unfair competition). "[W]hen a company hires essentially all of the sales/marketing staff of one agency, the purpose in doing so is to induce the clients of that agency to move their business with that sales force." *B.G. Balmer & Co. v. Frank Crystal & Co., Inc.*, 148 A.3d 454, 466, 472 (Pa. Super. 2016) (affirming award of punitive damages following plaintiff's successful verdict on, among other claims, unfair competition), *appeal denied*, 2017 WL 1015542 (Pa. Mar. 4, 2017).

Seckel's first argument — that the contested information is not a protectable trade secret — assumes that an unfair competition claim is limited in scope. But to succeed on an unfair competition claim, Centennial was not limited to demonstrating that Spadaccini's customer list was confidential or a trade secret. *See Reading Radio*, 833 A.2d at 212. Similarly, it was unnecessary for Centennial to establish that Seckel had the intent of hiring Spadaccini for the customer list. *See id.* Centennial, as Seckel recognized in its brief, Seckel's Brief at 26, could succeed in its unfair

competition claim by establishing that Seckel hired Centennial's employees with the intent of harming Centennial.

Recognizing our highly deferential standard of review, **WMI Grp.**, 109 A.3d at 747-48, the record supports the trial court's issuance of a preliminary injunction. As noted above, Seckel acknowledged hiring one of Centennial's loan processors and six out of Centennial's twenty-two loan officers, or almost 30%. N.T, 2/4/16, at 26, 131. Of those six, Mr. Seckel personally recruited two, and he reached out to other Centennial employees. *Id.* at 125-26. Seckel also hired two former Centennial loan officers after they were "let go." *Id.* at 49, 131.

The record also reflects that Walsh, formerly a Centennial loan officer and now a vice-president at Seckel, e-mailed threats to the president of Centennial from his personal account. N.T., 2/4/16, at 64-65, 68. Walsh said he would destroy Centennial unless he was paid what he believed he was owed. Centennial's Ex. 59; R.R. at 964a. Walsh also posted a similar threat on his Facebook page. Centennial's Ex. 60; R.R. at 966a. Although the court had questioned whether Walsh's actions could be imputed to Seckel, N.T., 2/4/16, at 166, its opinion cited the personal threat as a basis for injunctive relief. Trial Ct. Op. at 2.

Taking all of this evidence together, the record substantiates the trial court's determination that injunctive relief was warranted because Centennial demonstrated a likelihood of success on its unfair competition claim. Although Seckel did not hire three of Centennial's employees, its

hiring of almost 30% of Centennial's loan officers, in conjunction with the threat to destroy Centennial, is sufficient to establish that a purpose of hiring Centennial's employees was to cripple and destroy Centennial. **See Reading Radio**, 833 A.2d at 212.[21] Because Centennial has established a likelihood of success on this claim, we need not examine whether Centennial could similarly succeed at trial on the other five claims.

## The Trial Court's Failure To Require an Injunction Bond

Although our review of an order granting preliminary injunctive relief is highly deferential, **WMI Grp.**, 109 A.3d at 747-48, the trial court must still comply with the applicable rules of law in entering the injunction. Whether the trial court properly complied with a Rule of Civil Procedure is a question of law. **See Sahutsky v. H.H. Knoebel Sons**, 782 A.2d 996, 998 (Pa. 2001).

For its last issue, Seckel asserts that Pennsylvania Rule of Civil Procedure 1531(b) required that Centennial post a bond before an injunction could be entered. Seckel notes that the trial court's order failed to provide for the posting of security and argues that "an appellate court must invalidate a preliminary injunction if a bond is not filed by the plaintiff." Seckel's Brief at 27 (citing **Berger v. W. Jefferson Hill Sch. Dist.**, 669 A.2d 1084, 1086 (Pa. Cmwlth. 1995) (citing **Christo v. Tuscany Inc.**, 454

---

[21] Of course, the fact-finder may reach different conclusions following a final hearing.

A.2d 1042, 1044 (Pa. Super. 1982)), *appeal denied*, 677 A.2d 840 (Pa. 1996)).

Centennial concedes that a bond was not posted, but asserts that the bond's absence does not require this Court to vacate the injunction. Centennial's Brief at 23. Centennial posits that when issuance of an injunction is proper, an appropriate remedy is to remand for the sole purpose of setting a bond. *Id.* at 24 (citing *Walter v. Stacy*, 837 A.2d 1205, 1210 (Pa. Super. 2003)). Centennial does not object to posting a reasonable bond but suggests the issue would be moot if it again filed, and the court now granted, a motion to set bond. As the trial court did not order a Pa.R.A.P. 1925(b) statement, the court did not address the issue of the bond in its Rule 1925(a) opinion.

As a prefatory matter, because Centennial filed, but the court denied without prejudice, a motion to set a bond, Order, 6/22/17, this issue is not moot and is properly before us for disposition. The applicable rule is Pa.R.C.P. 1531(b), which provides that —

[A] preliminary or special injunction shall be granted **only** if

(1) the plaintiff files a bond in an amount fixed and with security approved by the court, naming the Commonwealth as obligee, conditioned that if the injunction is dissolved because improperly granted or for failure to hold a hearing, the plaintiff shall pay to any person injured all damages sustained by reason of granting the injunction and all legally taxable costs and fees[.]

Pa.R.C.P. 1531(b)(1) (emphasis added).

In **Walter**, the trial court issued a preliminary injunction but refused to order a bond. **Walter**, 837 A.2d at 1208. This Court held that —

> The bond "requirement is **mandatory** and an appellate court **must invalidate** a preliminary injunction if a bond is not filed by the plaintiff." **Soja v. Factoryville Sportsmen's Club**, 361 Pa. Super. 473, 522 A.2d 1129, 1131 (1987) (emphasis supplied). "Even if the trial court's order was otherwise proper, its failure to require the posting of a bond mandate[s] our reversal of its decision." **Id.**

**Id.** The Court concluded —

> [W]e have no choice but to vacate the order of the trial court due to its failure to require a bond. We note however, that although the court's failure in this regard renders the injunction null, the error may be cured by the re-issuance of the preliminary injunction if the order includes the requirement of a bond.

**Id.** (footnote omitted). Similarly, in **Christo**, because the trial court erred in not imposing a bond, we vacated the injunction and remanded to have the court and plaintiffs comply with Rule 1531(b). **Christo**, 454 A.2d at 1044.

Here, notwithstanding both parties' agreement that the trial court must require a bond, the trial court declined to impose that requirement. The court did not explain its reasoning, but its decision was erroneous. **See** Pa.R.C.P. 1531(b); **Walter**, 837 A.2d at 1208; **Christo**, 454 A.2d at 1044. The trial court failed to comply with the plain language of 1531(b), which mandates a bond. **See Sahutsky**, 782 A.2d at 998. Therefore, we are constrained to vacate the injunctive order and remand with instructions to reissue the injunction with a bond.

J-A04018-17

Order vacated. Matter remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/26/2017