**Peter v. SANTORO, Appellee,**

v.

**Paul E. MORSE, Cable Technologies International, Inc., and Cable Technologies International of New York, Inc., Appellants.**

Superior Court of Pennsylvania.

Argued May 3, 2001.
Filed Aug. 1, 2001.

Raymond McGarry, Philadelphia, for Morse, appellant.

Mark J. Oberstaedt, Philadelphia, for appellee.

Before: DEL SOLE, President Judge, CAVANAUGH, J., McEWEN, President Judge Emeritus, JOHNSON, JOYCE, STEVENS, MUSMANNO, LALLY– GREEN, and TODD, JJ.

McEWEN, President Judge Emeritus.

¶ 1 This appeal[1] has been taken by Paul Morse (hereinafter "appellant"), Cable

---

1. Pursuant to Pa.R.A.P. 311(a)(4) an interlocutory appeal as of right may be filed from an order granting a preliminary injunction.

Technologies International, Inc. (hereinafter "CTI"), and Cable Technologies of New York, Inc. (hereinafter "CTINY"), from a preliminary injunction entered on February 7, 2001[2]. That injunction provided:

## ORDER

AND NOW, this 7th day of February, 2000, after hearings on 12/29/98; 12/30/98; 2/10/99; 2/11/99; 3/23/99; 3/25/99; and conference on December 23, 1999, on Plaintiff's Request for Preliminary Injunction, and after review of the record as well as the parties briefs, findings of fact and conclusions of law submitted by the parties, as well as all relevant case law, we hereby ORDER and DECREE as follows:

1. Plaintiff is, and at all times was, fifty percent (50%) owner of CTI;
2. Plaintiff is restored as an employee of CTI effective January 1, 1997, with his 401k plan effective as of that date;
3. All of Defendant CTINY's stock is hereby placed in constructive trust on behalf of CTI;
4. An accounting is ORDERED from Defendant Morse for all funds disbursed to him by CTI, or used by him to repay CTI;
5. An accounting is ORDERED for all business operations for CTI and CTINY;
6. Plaintiff is given unfettered access to the offices of CTI and CTINY via his attorney as long as such access does not impede the normal business of either corporation;
7. Plaintiff is given unfettered access to the books of CTI and CTINY, via his attorney, as long as such access does not impede the normal business of either corporation; and,
8. All of Plaintiff's remaining injunctive requests are DENIED.

¶2 Appellants, Paul E. Morse, Cable Technology International, Inc., and Cable Technologies of New York, Inc. (hereinafter "CTINY") contend that there were no reasonable grounds[3] for the entry of the preliminary injunction issued by the trial court, and thus request that we vacate the injunction.

---

**2.** This appeal was originally argued before a panel of this Court which issued a memorandum decision affirming the decision of the trial court. Upon motion of appellants, reargument before the Court en banc was granted.

**3.** Appellants have set forth the following arguments in support of their request for reversal:

1. Whether there were reasonable grounds for the entry of a preliminary injunction where the action is one properly addressed in law rather than equity, particularly where the lower court acknowledged that money damages may ultimately make appellee whole?
2. Whether there were reasonable grounds for the lower court's determination that appellee is and always was a 50% owner in CTI where there are already pending claims for determination by a jury as to appellee's shareholder status in light of a disputed shareholder's agreement between the individual parties?
3. Whether there were reasonable grounds for the entry of a preliminary injunction where it restores appellee as an employee with back pay and benefits despite appellee's at-will employment status having been terminated?
4. Whether there were reasonable grounds for the entry of a preliminary injunction where appellee's claims were barred by the applicable statute of limitations and the doctrine of laches?
5. Whether there were reasonable grounds for the entry of a preliminary injunction where it imposes a constructive trust upon CTINY for the benefits of CTI, despite that no derivative claim was ever filed?
6. Whether there were reasonable grounds for the entry of a preliminary injunction where it ordered an accounting on a preliminary injunction basis?

[O]ur review of the grant ... of a preliminary injunction is limited to determining whether there were any apparently reasonable grounds for the action of the trial court. We will interfere with the trial court's decisions regarding a preliminary injunction only if there exist no grounds in the record to support the decree, or the rule of law relied upon was palpably erroneous or misapplied. It must be stressed that our review of a decision regarding a preliminary injunction does not reach the merits of the controversy.

*Palladinetti v. Penn Distribs., Inc.*, 695 A.2d 855, 863 n. 11 (Pa.Super.1997) (citations and quotation marks omitted). "The court which is to exercise discretion in the matter of issuance of an injunction is the trial court and not the appellate court and the action of the trial court may be reviewed on appeal only in the case of a clear abuse of discretion but not otherwise." *Maritrans GP, Inc. v. Pepper, Hamilton & Scheetz*, 529 Pa. 241, 602 A.2d 1277, 1286 (1992).

*Anchel v. Shea*, 762 A.2d 346, 351 (Pa.Super.2000).

¶ 3 Cable Technologies (hereinafter CTI) was founded in 1986 by three individuals then employed by General Instruments, Paul Morse, Peter Santoro, and Jim Ware. The company, incorporated in 1986 as a New Jersey corporation,[4] supplies new and refurbished cable television equipment to wireless and cable television companies throughout the United States.

¶ 4 Appellant Paul Morse left his job as a marketing director for General Instruments to devote his full-time energies to CTI, while appellee Peter Santoro continued as the director of software development for General Instruments until 1991, spending evenings and weekends working on developing and maintaining the computer system of CTI. In the early days of CTI, all three individuals assisted in every sphere of the operation, from strategic planning to unloading trucks. Upon the withdrawal of Jim Ware from the corporation in 1991, Mr. Morse and Mr. Santoro each became a 50% shareholder in CTI. Mr. Morse served as the President of CTI and as its unofficial Chief Executive Officer from the inception of the company until the hearing on the injunction.[5] The shareholders agreed when they began CTI that the net profits of the corporation would be recorded on the corporation's books as having been paid as bonuses to the employee/shareholders, who would then lend the entire bonuses, minus the resulting tax liability, to the corporation as shareholder loans. These loans were carried on the books of the corporation as bearing interest at prime plus two percent. Mr. Morse testified that these "loans" were necessary to provide working capital to the corporation. While the company continued to grow and prosper from 1986 through 1997, no corporate meetings were held and most, if not all, business decisions were made—unilaterally—by Mr. Morse. The relationship between Mr. Morse and Mr. Santoro began to deteriorate after Mr. Santoro became a full-time employee in 1991, and in 1993 they discussed the possibility of a buyout by Mr. Morse of Mr. Santoro's 50% interest in the corporation. Mr. Morse testified that in December of 1993 he orally offered to acquire Mr. Santoro's 50% share in the corporation in ex-

---

4. Mr. Morse testified that although the business was located in Pennsylvania, it was incorporated pursuant to New Jersey law solely because the corporate attorney was more familiar with New Jersey law.

5. Apparently, no corporate minutes were ever maintained, no shares were ever issued, and no individual was ever elected as an officer or director of the corporation.

change for payment of 50% of the retained earnings of CTI for the years 1994 through 1998 plus repayment of Mr. Santoro's outstanding shareholder loans.[6] Although Mr. Morse disputes Mr. Santoro's claim that this offer was rejected, in a letter dated July 17, 1994, and introduced into evidence at the hearing on the injunction, Mr. Morse suggested a "shotgun approach" buyout, whereby Mr. Santoro would establish the purchase price for 50% of the corporation and Mr. Morse could either accept the offer or tender his 50% share of the corporation in exchange for the price set by Mr. Santoro. Mr. Santoro responded in September of 1994 with an outline of an offer in a document entitled "Intent of Proposed Document;"[7] but this document was never signed and no written evidence of a completed offer and acceptance was produced by Mr. Morse. Moreover, the corporation's federal and state tax returns were produced and all of the official filings reflected, for each of the years up until the time of the hearing, that Mr. Morse and Mr. Santoro were each owners of 50% of the corporation. Mr. Morse's individual tax returns for 1993 through 1997 also reflected that he was a 50% owner of CTI, and not, as he now contends, the sole owner of CTI.

¶ 5 In March of 1994, Mr. Morse submitted a proposal to Converter Parts Incorporated for the acquisition of all of its assets by "Cable Technologies International, Inc. or a newly formed company owned by P.E. Morse, Jr." The agreement provided, *inter alia*, for CTI rather than the new company to incur penalties of 2% interest on any late payments to Converter Parts, and obligated CTI and not the new company to rent Converter Parts' Espera, New York, facility for 5 years at $500 per month. The proposal also provided that CTI would be the party responsible for payment of a total of $473,200 for the purchase of Converter Parts. This agreement was signed *only* by Paul Morse, acting not in his individual capacity, but as "Paul E. Morse, Jr., President, Cable Technologies International, Inc.".

¶ 6 On November 17, 1994, Cable Technologies International of New York, Inc. (hereinafter "CTINY") was incorporated and Paul Morse became the sole shareholder in the corporation. The next day, on November 18, 1994, CTINY, CTI and Converter Parts, Inc., entered into a contract entitled: "Agreement of Understanding and Contract for Sale and Lease Between Converter Parts, Inc. (CPI), and Cable Technologies International, Inc., and Cable Technologies International of NY, Inc. (CTI), Paul E. Morse, Jr. Both Parties Being Authorized by the Owners of CPI and CTI." There was no corporate resolution by CTI authorizing such purchase, nor was the consent of Mr. Santoro sought or obtained.

¶ 7 CTI began making installment purchase payments to Converter Parts, Inc., pursuant to the agreement for the purchase of its assets. In early 1995 Mr. Morse transferred all of the parts business previously conducted by CTI to his new, wholly-owned corporation, CTINY. Mr. Santoro's authorization or consent for this transfer of business opportunities previously enjoyed by CTI was not sought. No compensation was paid by CTINY to CTI for its entire parts business despite the fact that in 1994 CTI had received more

---

6. Since, as a 50% shareholder, Mr. Santoro was entitled by law to 50% of the retained earnings of the corporation if he did *not* sell his shares, this offer appears somewhat illusory.

7. This document expressly provided that the language in the proposal was not to be considered a legally binding agreement and did not create an agreement of sale for the shares held by Mr. Santoro.

than $500,000 in revenue as a result of the sale of parts.[8]

¶ 8 Uncontradicted evidence produced at the hearings before the distinguished Judge Maurino J. Rossanese, Jr., established that

A $10,000 check drawn on CTI was used for the initial down payment.

A $40,000 check drawn on CTI was used for the second payment.

Two additional checks, each in the amount of $100,000 were drawn on CTI's account for the payments for acquisition of Converter Parts, Inc.

¶ 9 Mr. Santoro also introduced substantial, uncontradicted evidence which established that in 1997 Mr. Morse caused CTI to purchase 50,000 new converters from Jerrold Communications. This purchase was made possible by an increase in CTI's existing line of credit to $3.5 million, which line of credit had originally been and continued to be guaranteed by Mr. and Mrs. Santoro individually as well as Mr. and Mrs. Morse individually, and secured by mortgages on their respective residences. CTINY received in excess of $5 million in revenue from the sales of the converters obtained from Jerrold, and realized a net profit of approximately $1,480,000. No portion of the profit realized from these sales was attributed to CTI. Mr. Morse in 1997 received compensation from CTINY of $1.2 million and compensation from CTI of $764,905.

¶ 10 Beginning in 1994 and 1995, Mr. Morse provided for the corporation to pay Mr. Santoro a salary which was $160,000 less than the salary paid by CTI to Mr. Morse. Mr. Morse explained that he had unilaterally altered the previously equal compensation scheme for the following reason: "I told him that this was—that I didn't like the fifty-fifty profit agreement where we had agreed. I felt working for him for five years was inappropriate." N.T. December 29, 1998, p. 98.[9]

¶ 11 Mr. Morse terminated Mr. Santoro's employment with CTI in 1997 and relocated CTI to a building wholly owned by his 22–year–old daughter. As a result of the move, Mr. Santoro no longer had keys to the building and was informed by Mr. Morse that he was no longer "employed" by CTI.

¶ 12 The no interest advances made from CTI to CTINY were eventually "repaid" to CTI after protest from Mr. Santoro by reducing the balance of Mr. Morse's shareholder loan account. Mr. Santoro's requests for repayment of a portion of his shareholder loan account were denied.

■ ¶ 13 Appellant initially claims that the court was without the equitable jurisdiction to enter the injunction since the injury alleged by appellee was not "irreparable" because appellee could be made whole by an award of money damages. This contention may be summarily rejected as meritless based upon settled precedent of this Court and our Supreme Court:

An injury is regarded as "irreparable" if it will cause damage which can be estimated only by conjecture and not by an accurate pecuniary standard. *Boehm v. University of Pennsylvania School of Veterinary Medicine*, 392 Pa.Super. 502, 522, 573 A.2d 575, 586, *appeal denied,*

---

8. CTI received $411,331.00 from the sale of parts in 1993 and increased that portion of its business to $561,883.00 in 1994. After the creation of CTINY, CTI did not earn *any* income from parts, all of the business having been transferred, without consideration, to CTINY.

9. This reference to five years refers to the period from 1987 up to and including 1991 when Mr. Morse was a full-time employee of CTI and Mr. Santoro was still employed by General Instruments.

527 Pa. 596, 589 A.2d 687 (1990). *See John G. Bryant Co. v. Sling Testing and Repair, Inc.,* 471 Pa. 1, 8, 369 A.2d 1164, 1167 (1977) (plaintiff may establish "irreparable" harm by proving the likelihood of a loss that is not entirely ascertainable and hence compensable by money damages). For purposes of a preliminary injunction, harm must be irreversible before it will be deemed "irreparable." *Boehm, supra.*

Pennsylvania courts sitting in equity have jurisdiction to prevent the continuance of acts prejudicial to the interest of individual rights, including the authority to enjoin wrongful breaches of contract where money damages are an inadequate remedy. *Straup v. Times Herald,* 283 Pa.Super. at 68, 423 A.2d at 718. **In the commercial context, the impending loss of a business opportunity or market advantage may aptly be characterized as an "irreparable injury" for this purpose.** For example, in the case of *John G. Bryant Co., Inc. v. Sling Testing and Repair, Inc., supra,* our Supreme Court approved a preliminary injunction enforcing an anticompetitive employment covenant on the grounds that the alleged interference with customer relationships would be "irreparable" because the extent of the injury was inherently unascertainable, and hence incapable of being fully compensated by money damages. Likewise, in *Courier Times, Inc. v. United Feature Syndicate, Inc.,* 300 Pa.Super. 40, 445 A.2d 1288 (1982), this court held that a newspaper would suffer irreparable injury by being deprived of a popular syndicated feature. The Superior Court found that loss of the "Peanuts" comic strip would hamper efforts to compete for the business of the customers of a defunct publication. The loss was considered irreparable as the number of lost customers could not be accurately tabulated. *Sovereign Bank v. Harper,* 449 Pa.Super. 578, 674 A.2d 1085, 1093 (1996) (emphasis supplied), *appeal denied,* 546 Pa. 695, 687 A.2d 379 (1996). *Accord: West Penn Specialty MSO, Inc. v. Nolan,* 737 A.2d 295, 299 (1999).

¶ 14 Since there is substantial support in the record for the finding of the trial court that Mr. Morse was transferring the business opportunities of CTI to CTINY, the trial court could properly find that the conduct at issue was causing irreparable injury to Mr. Santoro, who was entitled to one-half of the net profits of CTI. Nor, as the foregoing recitation of the underlying facts reveals, and as we shall recount, is there merit in the claim of appellant that there were no reasonable grounds upon which the trial court could find that Mr. Santoro "is and always was a 50% owner of CTI." [10]

■ ¶ 15 All parties agree that Mr. Morse was solely responsible for all corporate financial decisions as well as all tax filings, and agree that all state and federal filings, corporate and individual, for the years 1991 through 1997, reflected that Mr. Santoro owned 50% of the stock of CTI. While appellant testified that he believed an oral agreement to purchase Mr. Santoro's stock had been reached in 1993, appellant failed to produce any evidence other than his own testimony in support of this claim. Thus, there were ample grounds upon which the trial court could reasonably conclude for purposes of the hearing on the preliminary injunction that Mr. Santoro owned 50% of CTI.

¶ 16 Appellant also contends that, since ownership of the corporation is an issue to be resolved at trial, the trial court erred in

---

**10.** For the same reasons, we find that there is no merit in the claim of appellant that the trial court should have found that injunctive relief was barred by the statute of limitations.

making a determination on the issue of ownership in the proceeding for a preliminary injunction.

▮ ¶ 17 The purpose of a preliminary injunction is to preserve the status quo as it exists *or previously existed before the acts complained of,* thereby preventing irreparable injury or gross injustice. To establish the right to preliminary injunctive relief, the moving party carries the burden of showing:

(1) that relief is necessary to prevent immediate and irreparable harm which cannot be compensated by damages; (2) that greater injury will occur from refusing the injunction than from granting it; (3) that the injunction will restore the parties to the status quo as it existed immediately before the alleged wrongful conduct; (4) that the alleged wrong is manifest, and the injunction is reasonably suited to abate it; and (5) that the plaintiff's right to relief is clear.

*Cappiello v. Duca,* 449 Pa.Super. 100, 672 A.2d 1373, 1376 (1996) *quoting Lewis v. City of Harrisburg,* 158 Pa.Cmwlth. 318, 631 A.2d 807, 810 (1993).

▮ ¶ 18 Because the trial court was authorized to grant the relief requested by appellee ONLY if the court was satisfied that appellee's "right to relief [was] clear." *Lewis v. City of Harrisburg, id.,* the court was **required** to determine if appellee had produced substantial credible evidence in support of his claim that he was the owner of 50% of the stock of CTI. The argument presented by appellant that such evidence should not have been considered[11] has been previously addressed by the Commonwealth Court which cogently explained that, since the moving party is required to establish a clear right to relief in order to obtain injunctive relief,

it is of course necessary that the moving party be able to show that he has a reasonable likelihood of success on the merits. It is thus entirely reasonable and proper for a court to consider testimony going to the merits at the time of a preliminary injunction hearing....

*Riverside School Board v. Kobeski,* 146 Pa.Cmwlth. 106, 604 A.2d 1173, 1175 (1992). *Accord: L.B. Foster Co. v. SEPTA,* 705 A.2d 164, 167 (Pa.Cmwlth.1997), *appeal denied,* 557 Pa. 633, 732 A.2d 617 (1998); *Lewis v. City of Harrisburg, supra.* We are mindful, of course, that as this was a proceeding on a petition for a preliminary injunction, the issue of the ownership of the corporation must still be litigated at trial, since principle of *res judicata* and collateral estoppel are inapplicable to the findings of the court in the proceedings on the preliminary injunction. *See: Riverside School Board v. Kobeski, supra,* 604 A.2d at 1176.

▮ ¶ 19 Nor is there merit to the argument of appellant that by finding that appellee was and remained a 50% shareholder of CTI, the court has attempted to convert the preliminary injunction hearing into a hearing on a permanent injunction. While the trial court conducted a full and exhaustive hearing based on the merits of the instant controversy, in the absence of a stipulation by the parties, the court could not—and did not—convert the proceeding for a preliminary injunction into a final hearing. *See: School District of Pittsburgh v. Pittsburgh Federation of Teachers,* 486 Pa. 365, 373, 406 A.2d 324, 328 (1979); *Soja v. Factoryville Sportsmen's Club,* 361 Pa.Super. 473, 522 A.2d 1129, 1131 (1987); *Burrell Education Association v. Burrell School District,* 674 A.2d 348, 350 n. 3 (Pa.Cmwlth.1996). Rather, the court was empowered and obliged to

---

11. Appellant offered evidence to establish, in opposition to the issuance of a preliminary injunction, that appellee had sold his 50% interest to appellant in 1993.

grant such temporary relief as would preserve the status quo, namely, an order which would restore the "last actual, peaceable and lawful non-contested status which preceded the pending controversy." *Lewis v. City of Harrisburg, supra,* 631 A.2d at 810 *citing Commonwealth v. Coward,* 489 Pa. 327, 341, 414 A.2d 91, 99 (1980). Since appellant, at all times from 1991 through 1997, had personally caused the corporate records, government filings and tax returns of CTI to reflect that Mr. Santoro was a 50% owner of the corporation, the preliminary injunction simply "preserve[d] the status quo as it ... existed before the acts complained of...." *Anchel v. Shea, supra,* 762 A.2d at 355 (Pa.Super.2000) *quoting Three County Services, Inc. v. Philadelphia Inquirer,* 337 Pa.Super. 241, 486 A.2d 997, 999 (1985), including the status of Mr. Santoro as a 50% owner of CTI. Thus, it is clear that the trial court, in determining for purposes of the preliminary injunction, that appellee was to continue as a 50% shareholder of CTI, simply continued the status quo which appellant had created.

 ¶ 20 Appellant next argues that the court improperly ordered appellee restored as an employee and improperly ordered the payment of lost wages and benefits. While the record created by the parties during six full days of hearings over the course of four months,[12] paints a compelling picture of outrageous overreaching and usurpation of corporate assets and opportunities by appellant, we are constrained to agree that in the absence of a stipulation converting the preliminary injunction hearing into a hearing

on a permanent injunction, the relief granted by the trial court was overly broad. While we agree with appellee that there were more than reasonable grounds for the ruling of the trial court, appellee is not entitled in a proceeding for a preliminary injunction, to the relief that may be ultimately awarded in the civil trial.[13] *See: Soja v. Factoryville Sportsmen's Club, supra.*

 ¶ 21 A preliminary injunction must be crafted so as to

> be no broader than is necessary for the petitioner's interim protection. *Three County Services, Inc. v. Philadelphia Inquirer,* 337 Pa.Super. 241, 486 A.2d 997, 1000 (1985). "Furthermore, when a preliminary injunction contains mandatory provisions which will require a change in the position of the parties, it should be granted even more sparingly than one which is merely prohibitory." *Id.*

*Anchel v. Shea, supra,* 762 A.2d at 352. Thus, we are constrained to vacate that portion of the injunction which restored appellee as an employee and awarded lost wages and benefits, not because there were no reasonable grounds to support the order, but because the relief awarded exceeded the proper scope of relief in a proceeding for a preliminary injunction. *Anchel v. Shea, id.* at 355.

 ¶ 22 We do not agree, however, that the same infirmity is found in those portions of the injunction which (a) impressed the stock of CTINY with a constructive trust in favor of CTI, and (b)

**12.** As a result of mediation attempts, a year elapsed between the last hearing date of March 25, 1999, and the order entered February 7, 2000.

**13.** We are not unmindful of the unique circumstances herein where, if appellee is ultimately determined to be the owner of 50% of

the corporation, issues regarding the amount of the payments necessary to make him whole will arise, including the source of the funds—whether corporate or personal—and the effects on appellee's tax liability due to the failure to make timely contributions to his 401K plan. We are confident, however, that such issues can await resolution at trial.

directed an accounting and access, via counsel, to the books of the corporation.

¶ 23 Section 1712(a) of the Business Corporation Law imposes a fiduciary duty upon a corporate *director* while Section 1712(c) provides that a corporate *officer* must act "in good faith, in a manner he reasonably believes to be in the best interests of the corporation...." 15 Pa.C.S. § 1712(a), (c). *See: Village of Camelback Property Owners Association, Inc. v. Carr,* 371 Pa.Super. 452, 538 A.2d 528, 536 (1988) *aff'd.* 524 Pa. 330, 572 A.2d 1 (1990); *CST Inc. v. Mark,* 360 Pa.Super. 303, 520 A.2d 469, 471 (1987), *appeal denied,* 517 Pa. 630, 539 A.2d 811 (1987).

¶ 24 Section 1767 of the Business Corporation Law, 15 Pa.C.S. § 1767(a)(2) provides that, upon application of a shareholder, the court may appoint a custodian of a corporation where

> (2) in the case of a closely held corporation, the directors or those in control of the corporation have acted illegally, oppressively or fraudulently toward one or more holders or owners of 5% or more of the outstanding shares of any class of the corporation in their capacities as shareholders, directors, officers or employees[.]

15 Pa.C.S. § 1767(a)(2).

¶ 25 This Court in *Leech v. Leech,* 762 A.2d 718 (Pa.Super.2000), affirmed the order of the trial court which had appointed a custodian, in the case of a dispute arising between two 50% shareholders of a closely held corporation, based on the trial court's finding that one shareholder had oppressed the other. The trial court in the instant case, however, found that appointment of a custodian would not be in the best interests of the corporation. Instead, in an effort to achieve the same type of protection, i.e. to preserve the assets of CTI pending resolution of the merits of the corporation, the court imposed a

constructive trust upon CTINY in favor of CTI until resolution of the dispute at trial.

> A constructive trust arises when a person holding title to property is subject to an equitable duty to convey it to another on the ground he would be unjustly enriched if he were permitted to retain it. *Yohe v. Yohe,* 466 Pa. 405, 353 A.2d 417 (1976); *Denny v. Cavalieri,* 297 Pa.Super. 129, 443 A.2d 333 (1982). The necessity for such a trust may arise from circumstances evidencing fraud, duress, undue influence or mistake. *Id.* The controlling factor in determining whether a constructive trust should be imposed is whether it is necessary to prevent unjust enrichment. *Roberson v. Davis,* 397 Pa.Super. 292, 580 A.2d 39 (1990).

*DeMarchis v. D'Amico,* 432 Pa.Super. 152, 637 A.2d 1029, 1036 (1994) (citation omitted). *Accord: Koffman v. Smith,* 453 Pa.Super. 15, 682 A.2d 1282, 1290–1291 (1996); *American Express Travel Related Services Co., Inc. v. Laughlin,* 424 Pa.Super. 622, 623 A.2d 854, 856 (1993), *appeal denied,* 535 Pa. 644, 633 A.2d 149 (1993). In light of the evidence suggesting that the assets and opportunities of CTI had been wrongfully diverted to benefit CTINY and Mr. Morse, the trial court in the exercise of its broad equity powers could properly order the temporary imposition of a constructive trust so as to preserve the assets of CTI pending trial.

¶ 26 Additionally, Section 1508 of the Business Corporation Law provides for the right of a shareholder to examine the corporate books for any proper purpose, 15 Pa.C.S. § 1508; *See: Zerbey v. J.H. Zerbey Newspapers, Inc.,* 385 Pa.Super. 109, 560 A.2d 191, 192–193 (1989), and provides for the Court of Common Pleas to "summarily order" such relief to a shareholder wrongfully denied access.

¶ 27 Consequently, in light of the fiduciary duty owed by appellant to the corporation and its shareholders, *CST, Inc. v. Mark, supra,* 520 A.2d at 471, and in light of the applicable provisions of the Business Corporation Law, we find that the portion of the injunction providing for a temporary constructive trust to be impressed upon CTINY in favor of CTI, and providing for an accounting, as well as access, via counsel, to the corporate books, was relief appropriately awarded in a proceeding for a preliminary injunction.

¶ 28 Thus it is that we vacate that portion of the preliminary injunction which ordered appellee restored as an employee of CTI, as well as that portion of the order which awarded back pay and benefits to appellee, while affirming those portions of the injunction which provide for an accounting, access to the corporate books, and the imposition of a constructive trust upon CTINY in favor of CTI.