J-A15038-21

**ON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| TENTH PRESBYTERIAN CHURCH | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| PHILIP SNYDER | : | |
| | : | |
| Appellant | : | No. 849 EDA 2020 |

Appeal from the Order Entered February 10, 2020
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  No. 190703016

BEFORE:  BOWES, J., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:           **FILED OCTOBER 18, 2021**

Philip Snyder ("Snyder") appeals from the Order granting the Emergency Motion for Injunctive Relief ("the Emergency Motion") filed by Tenth Presbyterian Church (the "Church").  We affirm in part, reverse in part, and remand for further proceedings.

The Church owns several properties in Philadelphia.  The Church's primary facility is located at 1701 Delancey Street ("the Property").  Snyder moved to Philadelphia in 2008, after which he joined the Church, where he remained a member until the Church excommunicated Snyder in August 2016. Snyder thereafter began picketing at the Property regarding his excommunication and the conduct of certain current and prior Church officials. Snyder brought a defamation action against individual members of the Church, but ultimately, a jury tendered a verdict against Snyder.

After the verdict in the defamation action, Snyder protested outside of the Property every Sunday, before and after Church services. On July 24, 2019, the Church filed a Complaint for an injunction and an Emergency Motion for Injunctive Relief for a preliminary injunction. The Church sought to restrict Snyder from coming within 1,000 feet of all properties owned by the Church. Following oral argument, Snyder temporarily agreed to the Church's requested relief.

The trial court subsequently conducted a hearing on the Church's Motion for a preliminary injunction on January 30, 2020, and February 10, 2020. The trial court described the evidence presented at that hearing as follows:

> [Snyder] testified [that] he began picketing outside [of] the Property after the March 22, 2019, jury verdict more frequently[,] with a sign that contained the phrase "naked beatings," "lying," and "rape[,]" because he was displeased with the results of the case. [Snyder] further testified that he had protested while wearing a body camera and film[ed] congregants outside [of] the Property. [Snyder] testified that [a trial court Order and subsequent Opinion in the defamation case] misrepresented the truth. Douglas Baker [("[] Baker")], [the Church's] former administrator, testified that [Snyder] frequently wore a visibl[y] "concealed" firearm to church services when he was a member[,] and that he continued the practice while picketing with the sign and body camera. [] Baker testified that [Snyder] would verbally harass and yell at congregants outside the Property and then post body camera videos on a blog. Dr. William Goligher [("Dr. Goligher")], senior minister for [the Church], testified that [Snyder] called him the "son of Satan" and a liar. Dr. Goligher testified that [Snyder] had verbally disparaged [Snyder's] own family for not committing to his protest and not being faithful, including referring to [Snyder's] wife as Job's wife…. Dr. Goligher also testified that [Snyder] seemed preoccupied with safety and firearms, such that he would stand beside Dr. Goligher and point out individuals who[m] he thought were carrying firearms. [Snyder's] fixation on security and policing[,] even minor

- 2 -

behaviors of [ the C]hurch congregants[,] went on for years and included concerns about stolen phones, money, and immigrants. [Snyder] himself provided testimony that he has been the only individual telling the truth, that he has mailed 100 pages of material to 200 members of the Church, that he will never stop any of his behaviors until [the Church's] leadership has resigned in full, and that [the Church] was trying to poison him and hire a hitman to assassinate him. Susan Elzey ("Ms. Elzey"), a congregant, testified that outside of [C]hurch services on June 16, 2019, [Snyder] told her he was an instrument of God, similar to a prophet, and that only [Snyder] knows the true nature of Dr. Goligher's soul. [Snyder] went on to tell Ms. Elzey that Dr. Goligher was a son of Satan, and that any congregants who support Dr. Goligher are doing Satan's work. [Snyder] also told Ms. Elzey that he was unhappy with his wife, described her as Job's wife because she did not support him, and that his oath to remove Dr. Goligher from the [C]hurch was more important to him than his family.

By Order dated February 10, 2020, [the trial court] granted [the Church's] Motion and enjoined [Snyder] from appearing within **five[ ]thousand (5,000) feet** of [the Church's] properties located at (1) 1701 Delancey [Street]; (2) 1700 Spruce [Street]; (3) 315 S. 17[th Street]; (4) 1710 Spruce [Street]; and [(5)] 1716 Spruce [Street]….

Trial Court Opinion, 8/21/20, at 1-5 (emphasis added). Thereafter, Snyder

filed the instant timely Notice of Appeal, followed by a court-ordered Pa.R.A.P.

1925(b) Concise Statement of matters complained of on appeal.

Snyder presents the following claims for our review:

1. Did the [trial court] commit an error of law and/or abuse its discretion by enjoining [Snyder] from peaceful protest that is constitutionally protected?

2. Did the [trial court] commit an error of law and/or abuse its discretion by failing to narrowly tailor its injunction to address the alleged harms claimed by [Snyder]?

- 3 -

3. Did the [trial court] commit an error of law and/or abuse its discretion by enjoining [Snyder] from peaceful protest where [the Church] had other adequate remedies at law?

4. Did the [trial court] commit an error of law and/or abuse its discretion in finding that [Snyder] posed the risk of imminent violent behavior, when there was no evidence that [Snyder] threated any of [the Church's] parishioners or other members of the public?

Brief for Appellant at 4.

We will address Snyder's first two claims together, as they are related. Snyder first claims that the trial court improperly enjoined him from constitutionally protected peaceful protest. *Id.* at 12. Snyder argues that his activities are protected under the First Amendment to the United States Constitution, and Article I, Section 7, of the Pennsylvania Constitution. *Id.* According to Snyder, our Supreme Court has held that the Pennsylvania Constitution prohibits "prior restraint on Pennsylvanians' right to speak." *Id.* at 14 (citations omitted).

Snyder relies upon our Supreme Court's decision in *Willing v. Mazzacone*, 393 A.2d 1155 (Pa. 1978), wherein our Supreme Court held that an injunction violated a protestor's "state constitutional right to freely speak her opinion[,] regardless of whether that opinion is based on fact or fantasy." Brief for Appellant at 14-15 (quoting *Willing*, 393 A.2d at 1158). According to Snyder, *Willing* is "directly applicable to these circumstances[.]" *Id.* at 15. Snyder disputes the Church's claim that *Willing* is distinguishable because, the Church asserts, "[Snyder's] actions are uniquely malicious[.]"

*Id.* Snyder points out that the Church offers no case law in support of its interpretation of *Willing*. *Id.*

Additionally, Snyder directs our attention to this Court's decision in *Klebanoff v. McMonagle*, 552 A.2d 677 (Pa. Super. 1988). Brief for Appellant at 17. According to Snyder, the *Klebanoff* Court, while upholding a permanent injunction against an abortion protestor in front of a physician's private residence, nevertheless assured that the protestors remained free to protest in front of the physician's practice, distribute leaflets, and telephone neighbors. *Id.*

Snyder disputes that his actions caused Church members to avoid the Church's services and prevented nonmembers from attending the Church. *Id.* at 18. According to Snyder, "[c]ourts recognized that all expressive conduct— especially acts of protest—by definition seek to influence the conduct of others." *Id.* Snyder also disputes the allegation that he will imminently undertake violent action against the Church and its worshipers. *Id.* at 19. Snyder asserts that such a claim is speculative and "based upon faulty reasoning." *Id.* According to Snyder, he is a productive member of society, working as a mechanic, and he has never been arrested. *Id.* at 20.

In his second claim, Snyder argues that the trial court improperly imposed a preliminary injunction that is not "narrowly tailored" to address the harms claimed by the Church. *Id.* at 27. Snyder asserts that, in the Emergency Motion, the Church sought to enjoin him from protesting within

one thousand feet of multiple Church facilities. *Id.* at 28. According to Snyder, "if granted, this injunction would prevent [him] from engaging in *all expressive conduct* within this geographic boundary[,] and does not leave open ample alternative channels for communication." *Id.* (emphasis in original, internal quotation marks omitted). Further, Snyder claims that the trial court "inexplicably," and on its own "initiative," quintupled the Church's request, and improperly imposed a five-thousand-foot injunction. *Id.* Snyder points out that previously, his conduct had been limited to the public sidewalks abutting the Church's property. *Id.* at 29.

Our review of a trial court's decision to grant or deny preliminary injunctive relief is "highly deferential." *Weeks v. Dep't of Human Servs.*, 222 A.3d 722, 727 (Pa. 2019). Our standard of review for granting a preliminary injunction "requires an appellate court only to determine if there were any apparently reasonable grounds for the lower court's action." *Turner Constr. v. Plumbers Local 690*, 130 A.3d 47, 66 (Pa. Super. 2015) (citations omitted).

To obtain a preliminary injunction, the requesting party must establish that

> (1) the injunction is necessary to prevent immediate and irreparable harm that cannot be compensated adequately by damages;
>
> (2) greater injury would result from refusing the injunction than from granting it, and, concomitantly, the issuance of an injunction will not substantially harm other interested parties in the proceedings;

(3) the preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct;

(4) the party seeking injunctive relief has a clear right to relief and is likely to prevail on the merits;

(5) the injunction is reasonably suited to abate the offending activity; and,

(6) the preliminary injunction will not adversely affect the public interest.

***Marcellus Shale Coal. v. Dep't of Envtl. Prot. of Pa.***, 185 A.3d 985, 1007-08 (Pa. 2018). Importantly, a preliminary injunction must be crafted so as to be no broader than is necessary for the petitioner's interim protection. ***Santoro v. Morse***, 781 A.2d 1220, 1230 (Pa. Super. 2001).

Snyder's claims implicate his constitutional right to freedom of speech. The First Amendment to the United States Constitution provides as follows:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. CONST. amend. I.

The United States Supreme Court has mandated that orders affecting First Amendment rights "must be tailored as precisely as possible to the exact needs of the case." ***Carroll v. Comm'rs***, 393 U.S. 175, 184 (1968). Therefore, "[a]n order issued in the area of First Amendment rights must be *couched in the narrowest terms* that will accomplish the pin-pointed objective

permitted by constitutional mandate and the essential needs of the public order." ***Turner Constr.***, 130 A.3d at 69 (citation omitted, emphasis added). As this Court has explained,

> [u]nder the federal constitution, any system of prior restraint bears heavy presumption against validity. ***New York Times Co. v. United States***, 403 U.S. 713 … (1971). ***See also***[] ***Near v. Minnesota***, 283 U.S. 697 … (1931). The U.S. Supreme Court has refused to uphold injunctions against speech intended to harm economically the business of another, even where the state courts have found the activities in question to be "coercive and intimidating, rather than informative."

***Franklin Chalfont Assocs. v. Kalikow***, 573 A.2d 550, 555-56 (Pa. Super. 1990).

The Pennsylvania Constitution affords greater protection to speech and conduct in this Commonwealth than does its federal counterpart, the First Amendment. ***Willing***, 393 A.2d at 1158; ***William Goldman Theaters, Inc. v. Dana***, 173 A.2d 59, 61 (Pa. 1961). Article I, Section 7 of the Pennsylvania Constitution provides that "[t]he free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty…." PA. CONST. art. I, § 7. Thus, Under Pennsylvania law, "peaceful picketing conducted in a lawful manner and for a lawful purpose is lawful, even though it shuts down, bankrupts or puts out of business the company or firm which is picketed." ***Franklin Chalfont Assocs.***, 573 A.2d at 556 (citation omitted).

Moreover, this special protection for free speech rights is deeply rooted in a history that is unique to Pennsylvania:

> The "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open," has special meaning for this Commonwealth, whose founder, William Penn, was prosecuted in England for the "crime" of preaching to an unlawful assembly and persecuted by the court for daring to proclaim his right to a trial by an uncoerced jury. It is small wonder, then, that the rights of freedom of speech, assembly, and petition have been guaranteed since the first Pennsylvania Constitution, not simply as restrictions on the powers of government, as found in the Federal Constitution, but as inherent and "invaluable" rights of man.

*Bodack v. Law Enf't All. of Am.*, 790 A.2d 277, 278-79 (Pa. 2001).

In *Willing*, relied upon by Snyder, a former client of a Philadelphia law firm, Helen Willing ("Willing"), picketed in a pedestrian plaza between office buildings, which also was a pedestrian pathway between two court buildings. *Willing*, 393 A.2d at 1156. Willing wore a sandwich-board sign claiming that the firm's two attorneys ("Attorneys") stole money from her and sold her out to an insurance company. *Id.* Willing also pushed a shopping cart with an American flag, rang a cow bell, and blew a whistle to attract further attention. *Id.* In a case in equity to enjoin Willing's activities, the trial court granted an injunction, prohibiting Willing from displaying patently false and libelous statements about Attorneys. *Id.* The equity court determined that Willing was "a woman firmly [in] the thrall of the belief that [the law firm] had defrauded her, an *idee fixe* which, either by reason of eccentricity or an even

- 9 -

more serious mental instability, refuses to be dislodged by the most convincing proof to the contrary." *Id.* at 1157.

Ultimately, on allowance of appeal, our Supreme Court reversed, concluding that Attorneys had an adequate remedy at law, in the form of an action for defamation. *Id.* at 1158. The Supreme Court explained that "the equity court [had] violated [Willing's] state constitutional right to freely speak her opinion—regardless of whether that opinion is based on fact or fantasy—regarding [Attorneys'] professional integrity …." *Id.*

With this in mind, our review of the record discloses that at the hearing, the Church presented the testimony of Church Administrator Douglas Baker ("Baker").[1] N.T., 1/30/20, at 17. Baker testified that, approximately two weeks after the defamation trial, a Church member alerted him that Snyder was on the sidewalk outside of the Church's property. *Id.* at 19-20. According to Baker, Snyder appeared every consecutive Sunday, until the court temporarily enjoined his actions. *Id.* at 20. Baker filed a police report on Snyder's activities, based upon emails from Church members that "there were direct threats against our senior minister, taking him out, things of this nature." *Id.* at 20-21. According to Baker, "I became so concerned for the senior minister's welfare that I felt it incumbent upon my office, with his

---

[1] Baker testified that, at the time of the hearing, he was no longer employed by the Church. N.T., 1/30/20, at 18.

permission, to file a police report, at least notating what was going on, with the Philadelphia Police Department." *Id.* at 21.

Baker testified regarding his understanding that Snyder wore a concealed weapon near the Property. *Id.* at 25. Baker explained that "[a]lmost a week did not go by" where he was not stopped by Church members, who were alarmed by Snyder's presence. *Id.* at 26. Members told Baker that they were concerned for their safety, after receiving emails from Baker. *Id.* Baker indicated that he received a "steady stream" of complaints from Church members. *Id.* at 35.

Regarding Snyder's actions on the sidewalk outside of the Property, Baker testified as follows:

> From my own observation and the recollection of others who spoke to me directly, post trial and verdict, there was an increased animation in [Snyder's] behavior. There were much more actions with verbal intrusions to the members when they would come than it was before trial. [Snyder] would definitely speak to members as they were entering the [C]hurch with more literature and the body camera, which he was wearing, and those videos would be posted on a social media site following his encounter with [Church] members and guests.

*Id.* at 26-28. Regarding Snyder's physical actions, Baker testified that Snyder "would step forward over the line, which he was legally bound not to cross, and speak with people, other members. I have witnessed that myself[,] as well as others in the membership as well." *Id.* at 27. Baker indicated that the "line" that Snyder crossed was 20 feet from the Property. *Id.* at 45.

Baker further testified that, following the verdict in the defamation trial,

> [Snyder] was noticeably different as he stood outside. It wasn't just the sign. It was the way that he interacted with members, the way that he posted videos, the way that he kept pamphleteering, as it were, the congregation after the verdict was given. They seemed to escalate after that, and, also, a new social media presence that we had not seen before….

*Id.* at 36. Baker explained that, as part of a committee to upgrade the Church's security, he received training in order to develop a security plan for the Church's facilities. *Id.* at 27. According to Baker, Snyder was the sole reason for the upgrade to security. *Id.* at 28. After attending training on active shooter situations, Baker became concerned over Snyder's behavior.[2] *Id.* at 32. On cross-examination, Baker acknowledged that he had not personally observed the weapon concealed on Snyder. *Id.* at 42.

The Church also presented the testimony of Ms. Elzey, a member of the Church. Ms. Elzey testified regarding her interaction with Snyder on June 16, 2019:

> As I was approaching the [Property] with my daughter and our guest, I was leading them towards the front entrance of the [Property], as [we] turned the corner to approach that entrance, I was aware of [] Snyder's presence, although I did not in any way engage with him, but as I continued towards the door, I heard him call out to me by name, very loudly. He proceeded to accuse me of being a liar, telling me very loudly that I should be ashamed of myself for lying. As he did so, in an effort to deescalate his behavior, I purposely did not make eye contact with him, and I proceeded into the [Property], but as I continued all the way up the stairs into the [Property], he continued to verbally harass me very loudly.

---

[2] On cross-examination, Baker acknowledged that Snyder was not the sole reason for his attendance at the training session. N.T., 1/30/20, at 47.

*Id.* at 71.  Ms. Elzey explained that she had testified on behalf of Dr. Goligher

and another Church official at the defamation trial.  *Id.* at 74.  Ms. Elzey

estimated that Snyder was at least 20 feet from her at that time, "if not more."

*Id.* at 72.

> Later that month, Ms. Elzey again encountered Snyder:
>
> I had observed that [Snyder] was in a conversation with a close friend of mine.  I decided that I would join that conversation.  I felt safe to do so, because there were other people near by who were clearly observing and ready to intervene if necessary.  I directly wanted to know why [] Snyder had considered me a liar.
>
> ….
>
> I commented to [Snyder] that he should trust God to be judge and to administer justice.
>
> His reply to me [] was that God uses human instruments, such as the prophets, and he saw himself to be God's instrument of justice, in that he claimed that nobody knew except for him and God who [Dr.] Goligher really is.  That was the son of Satan, and that any congregants who supports [*sic*] Dr. Goligher is doing Satan's work.
>
> ….
>
> He also stated to me that he had made an oath to God that he would never, ever cease his pursuit to see Dr. Goligher gone, and, at the same time, we discussed that we were concerned for his family.
>
> [Snyder] stated that he was very unhappy with his wife.  He referred to her as Job's wife, because she did not support him.

*Id.* at 76.  According to Ms. Elzey, Snyder also represented that his oath to

remove Dr. Goligher was more important than his oath to his family.  *Id.* at

77.  Ms. Elzey acknowledged that Snyder did not follow her into the Property.

*Id.* at 101. However, Ms. Elzey testified that Snyder's verbal protests could be heard inside of the Property, and alarmed members therein. *Id.* at 72.

Ms. Elzey stated that, at times during their discussion, Snyder became "very agitated. His hands were shaking. He was gesticulating a lot, and again, as I said, with an aggressive tone. At some points his demeanor would alternate between that and very agitated." *Id.* at 77. Ms. Elzey was concerned because there was "no amount of testimony or evidence that will disabuse [Snyder] of his false narrative concerning these events that he claims took place." *Id.* at 80.

At the hearing, Snyder testified that he was excommunicated from the Church on October 23, 2016. N.T., 2/10/20, at 8. According to Snyder, at that time, Dr. Goligher served him with a no-trespassing notice. *Id.* Snyder indicated that he began handing out letters, in front of the Property, on September 10, 2017. *Id.* Snyder testified that he has only held signs and protested at the Property near the corner of 17th Street and Spruce Street. *Id.* at 15. Snyder further asserted that he has always stood on the public sidewalk for his protests, and not on the Property. *Id.* at 15-16.

Snyder denied ever blocking the entrance or exit to the Property. *Id.* at 17. Snyder later clarified that he has not been on the Property since October 23, 2016. *Id.* at 21. Snyder denied ever physically attacking or restraining anyone outside of the Property. *Id.* at 17. Snyder explained that

he protested in front of the Property, because the back exit "is not wide enough to give a wide berth to people." *Id.*

Regarding his firearm, Snyder testified that he had obtained a license to carry a firearm in November 2012. *Id.* at 22. Snyder explained that he "was an armored car guard, so I previously had a .38 revolver from that, and I also inherited a .38 revolver from my uncle Darvin." *Id.* at 22-23. Snyder denied ever carrying a firearm while protesting in front of the Property. *Id.* at 23. Snyder stated that he voluntarily, permanently surrendered his firearms to the State Police and denied possessing firearms of any kind. *Id.* at 24-25. However, Snyder conceded that there is no restriction preventing him from purchasing another firearm. *Id.* at 26.

After the defamation trial, Snyder testified, he began a "blog." *Id.* at 43. Snyder testified that he began the blog "[s]ince I have been prevented from being on the sidewalk[.]" *Id.* at 44. Snyder confirmed that it was his desire to continue his protests and dissemination of articles until he is successful at removing Dr. Goligher from the Church. *Id.* at 47. Snyder admitted that people attending the Church "appear to be afraid of what they think I might do, not what I've actually done." *Id.* at 58. Snyder further acknowledged telling others that the only way to stop him would be if there was a "crucifixion or burning at the stake[.]" *See id.* at 62 (wherein Snyder acknowledged making such statements). Notwithstanding, Snyder

acknowledged that if the court placed a one-thousand-foot restriction on his protests, he would abide by the restriction, but continue to protest. *Id.* at 75.

At the conclusion of the hearing, the trial court expressed its concern over violent actions taken against churches throughout the country:

> The only thing I'm saying is this. Let's be realistic here. That is that [Snyder] can allege all he wants to, but there's something that's important here that we need to understand, as I said, the defense to defamation is truth.
>
> We know that, and if there's not truth to all the things he's saying, clearly it's actionable. Why? Because the law is designed to protect us, … from any conduct that would harm us, that is not right.
>
> Now, I'm not of the belief that we should have politically correct speech. I don't believe that, even as the [c]ourt, and I don't think there should be a law to protect being politically correct. [Snyder] can say what he wants to say. But the face [*sic*] is that is what he says, it should be truthful, because the other side, they have right[s,] too.

N.T., 2/10/20, at 169-70. The trial court ultimately ruled, "[T]he record is clear as to what the [c]ourt is doing, and I'm not going to say that [Snyder] should be within 1,000 feet of the [Property]. Absolutely not. He should be [*sic*] within, at least, 5,000 feet of that [C]hurch." *Id.* at 173.

In its Opinion, the trial court justified its grant of injunctive relief as narrowly tailored, because "Snyder is free to protest and distribute material outside of the five-thousand (5,000) foot restriction from [the Church's] properties. [Snyder] is free to continue mailing information and he is free to continue updating his blog and speaking to the press about [the Church]." Trial Court Opinion, 8/21/20, at 11. The trial court found that the five-

thousand-foot perimeter was necessary because of the "contentious litigious history between the parties, and because of [Snyder's] potentially violent behavior." *Id.*

Applying our "highly deferential" standard of review, we agree that the trial court had "apparently reasonable grounds" for the imposition of a preliminary injunction against Snyder. *See Weeks*, 222 A.3d at 727; *Turner Constr.*, 130 A.2d at 66. However, we cannot conclude that the five-thousand-foot injunction imposed upon Snyder was crafted so as to "be no broader than is necessary for the petitioner's interim protection." *See Santoro*, 781 A.2d at 1230 (citation omitted). Rather, the trial court couched its preliminary injunction in the broadest terms to protect the interest of the Church and its members, disregarding Snyder's constitutional right to protest the Church and its leadership. A five-thousand-foot restriction places Snyder well beyond the point at which his constitutional right to protest is utterly extinguished.[3] Put succinctly, the five-thousand-foot restriction is not "couched in the narrowest terms that will accomplish the pin-pointed objective

---

[3] We point out that the Church broadly requested a one-thousand-foot prohibition on Snyder's protests. Complaint, 7/24/19, at 10-11 (unnumbered). The Complaint couches the requested relief in the broadest terms, but does not afford Snyder his constitutional right to protest the Church and its leadership. Any preliminary injunction must be narrowly tailored to address the physical realities of each Church property, while balancing Snyder's federal and state right to free speech. *See Santoro*, 781 A.2d at 1230.

permitted by constitutional mandate and the essential needs of public order." ***Carroll***, 393 U.S. at 183.

Thus, we are constrained to reverse that portion of the preliminary injunction imposing a five-thousand-foot prohibition on Snyder's protests, not because no reasonable grounds supported the Order, but because the relief awarded far exceeded the proper scope of relief in a proceeding for a preliminary injunction. ***See Santoro***, 780 A.2d at 1230 (reversing the grant of a preliminary injunction that exceeded the proper scope of relief). We remand for further proceedings to impose a preliminary injunction that properly balances the interests of the Church with the constitutional rights of Snyder, and is "couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of public order." ***Carroll***, 393 U.S. at 183.

In his third claim, Snyder argues that the trial court improperly enjoined his protest, where the Church had an adequate remedy at law. Brief for Appellant at 24. Snyder points out that the Church repeatedly has characterized his actions as defamatory. ***Id.*** at 26. Snyder asserts that, by the Church's own admission, an adequate remedy at law exists for a defamation action. ***Id.***

Relatedly, in his fourth claim, Snyder challenges the trial court's finding that he posed a risk of imminent violent behavior. ***Id.*** at 30. Snyder contends that there is no evidence that he threatened anyone. ***Id.*** Snyder further

argues that there is no evidence that he ever carried a gun to the Church. *Id.* According to Snyder, the trial court attempted to support its conclusions with references to shootings at houses of worship. *Id.* at 31.

As set forth above, the record reflects that Snyder engaged in aggressive and agitated behavior that frightened and agitated Church members inside and outside of the Property. *See* N.T., 1/30/20, at 45 (wherein Baker testified that Snyder had crossed the 20-foot restriction when engaging in his protests), 27 (wherein Baker testified regarding Snyder's video recording congregants and posting them on social media), 26 (wherein Baker stated that he had received complaints that Snyder's actions alarmed congregants), 43 (wherein Baker testified regarding notifications from members that they would not attend services because of Snyder), 72 (wherein Ms. Elzey testified that Snyder's verbal protests could be heard inside of the Property, and alarmed members therein). We cannot conclude that an adequate remedy at law exists to compensate for impact to the rights of the Church and its members.

Regardless of whether these specific findings are supported in the record, our standard of review "requires an appellate court only to determine if there were any apparently reasonable grounds for the lower court's action." *Turner Constr.*, 130 A.3d at 66. Because there is a reasonable basis for the trial court's imposition of an injunction, we cannot grant Snyder relief on this aspect of his appeal.

In summary, while we affirm the trial court's determination that a preliminary injunction is warranted, we reverse the imposition of a five-thousand-foot restriction against Snyder. We remand for the trial court to fashion a limitation that achieves the specific needs of this case, *i.e.*, a distance that is sufficient to protect congregants' access to the Church and its services, yet continues to uphold Snyder's constitutional right to convey his dissatisfaction with the Church and its leadership. **See Turner, supra.**

Order affirmed in part and reversed in part. Case remanded for further proceedings consistent with this Memorandum. Superior Court jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/18/2021